JOSEPH I. CRONIN, ESQ., Petitioner, *v.* THE EIGHTH
JUDICIAL DISTRICT COURT OF THE STATE OF
NEVADA, IN AND FOR THE COUNTY OF CLARK,
and THE HONORABLE JOSEPH S. PAVLIKOWSKI,
District Judge, Respondents, and RALPH ENGLES-
TAD, BETTY A. ENGELSTAD, Individually and dba
IMPERIAL PALACE HOTEL AND CASINO, Las
Vegas, Nevada; THE IMPERIAL PALACE, INC., a
Nevada Corporation, Real Parties in Interest.

No. 19890

November 2, 1989                    781 P.2d 1150

[Rehearing denied April 19, 1990]

*Joseph I. Cronin,* for Petitioner.

*Bell & Young* and *Craig Hoppe,* Las Vegas; *Barker, Gillock,
Koning, Brown & Earley,* Las Vegas, for Respondents and Real
Parties in Interest.

## OPINION[1]

By the Court, ROSE, J.:

On December 14, 1984, James and Joan Scanlon were paying guests at the Imperial Palace Hotel in Las Vegas. While they were in their room on that date, a man dressed in a "hotel service type" uniform appeared in the room, robbed the couple and raped Joan Scanlon. Consequently, in 1986, the Scanlons commenced an action against the Imperial Palace Hotel and its owners (collectively referred to as Imperial Palace). On August 9, 1988, the Scanlons, represented by petitioner (Cronin), filed in the district court an amended complaint seeking damages from the Imperial Palace for, among other things, negligently failing to provide adequate security for the guests of the hotel.

Prior to the filing of the amended complaint, on either July 19, 1988, or July 21, 1988, Mick Shindell, the director of corporate security at the Imperial Palace, received a call from the hotel PBX that attorney Cronin was waiting to see him and to serve some papers on him.[2] Cronin was escorted to Shindell's office and served the papers. It appeared to Shindell that Cronin knew he was the director of corporate security, and Shindell assumed that

---

[1]Although the petition names both Joseph Cronin and Louis Wiener, Jr., as petitioners, the petition is signed only by Cronin. Further, only Cronin submitted an affidavit supporting the petition, and the petition contains arguments that are relevant only to Cronin. Therefore, it does not appear that Louis Wiener is challenging the order of disqualification in this case.

[2]The facts regarding the employees of the Imperial Palace are taken from the depositions of those employees.

his position in the hotel management structure was the reason that he was being served with the papers. Shindell conversed with Cronin for about 10 minutes, and then walked Cronin to the front of the hotel. Before Cronin left the premises, Shindell told him that "somebody may call him," regarding the *Scanlon* case.

Shindell called Cronin's office in Minden the following day. Shindell told Cronin that he wanted to meet with him personally to discuss the *Scanlon* case. Cronin was receptive to the idea, and a meeting was scheduled. Shindell then mentioned his plan to meet with Cronin to two other Imperial Palace employees, Shirley Albury and Ed Steffen.

Cronin met with Shindell the following Wednesday at a restaurant in Las Vegas. The meeting lasted about one and one-half hours at that location, and continued for an additional hour at Shindell's home. During the meeting, Shindell told Cronin that he was ordered to destroy any documents in his files which indicated that the security department at the Imperial Palace needed improvement. Shindell also gave Cronin several documents from the Imperial Palace during that meeting. Shortly afterwards, Shindell told Shirley Albury and Ed Steffen of his meeting with Cronin. Shindell telephoned Cronin the following day, and informed him that Shirley Albury wanted to talk to him.

Shirley Albury, the director of human resources at the Imperial Palace, first met Cronin at Shindell's house in mid or late July of 1988, within one week of her conversation with Shindell. Albury informed Cronin of her job title and duties at the Imperial Palace, and specifically asked Cronin if she could talk to him. According to Albury, Cronin did nothing to discourage her from talking to him. During her initial three-hour meeting with Cronin, Albury told Cronin that she was ordered to purge, and did purge from several personnel files, information that might harm the Imperial Palace in the *Scanlon* case. According to Albury, the files were purged during the hotel's process of responding to a request for production of documents.[3]

Albury met with Cronin on four subsequent occasions to discuss various aspects of the *Scanlon* case. Albury gave Cronin a 4-5 inch stack of Imperial Palace documents during the course of those meetings. The final meeting occurred at her home on September 8, 1988, when Cronin stopped by her home, unannounced, while she, Shindell and others were present. During the two hours that Cronin was in Albury's house, Cronin showed Albury and Shindell the draft of a document that he intended to file in court.

---

[3] There is no indication in the record that the attorneys representing the Imperial Palace had any knowledge of the alleged destruction of documents.

Ed Steffen, the chief of uniformed security at the Imperial Palace, met with Cronin on two occasions. The first meeting was arranged by Shindell at Steffen's request. Although Steffen met with Cronin at Shindell's home for about three hours, the two talked about the *Scanlon* case for only about fifteen minutes. The second meeting with Cronin was not scheduled; Steffen was simply present at Shindell's house when Cronin stopped by. They discussed the *Scanlon* case, and Cronin questioned Steffen regarding certain Imperial Palace documents. Steffen admitted giving documents to Shindell, and assumed that the documents were forwarded to Cronin.

On September 18, 1988, the Scanlons filed in the district court a motion to strike the answer of the Imperial Palace to the amended complaint, and for the entry of judgment in favor of the Scanlons due to the alleged willful destruction of evidence by the Imperial Palace. That motion alleged that the Imperial Palace had ordered hotel employees to purge embarrassing material from the hotel's files. In particular, the motion alleged that all security incident reports and crime reports predating January 1, 1983, were destroyed. The motion also alleged that personnel files concerning security employees were purged of negative evaluations and other material that might reflect negatively on the security in the hotel.

The Imperial Palace opposed the motion to strike, and categorically denied destroying any documents. Further, it labelled as untrue deposition testimony which indicated that documents were destroyed, and stated that other deposition testimony indicated that copies of the allegedly destroyed documents were still in existence.

In September of 1988, during the pendency of the motion to strike, the Imperial Palace filed in the district court a motion for a temporary restraining order and for a preliminary injunction. In that motion, the Imperial Palace asserted that Cronin acted improperly when he communicated with its employees without the consent of its attorneys. *See* SCR 182 (a lawyer is prohibited from communicating with an adverse party who is represented by an attorney without the consent of the attorney). Accordingly, the Imperial Palace asked that Cronin be enjoined from engaging in any further *ex parte* communications with its employees. The district court issued a restraining order on September 20, 1988. Cronin opposed the motion for a preliminary injunction.

On January 9, 1989, during the pendency of the request for an injunction, the Imperial Palace filed in the district court a motion to disqualify Cronin from representing the Scanlons in the action below. The Imperial Palace asserted that, prior to his meetings

with Cronin, Shindell had been present in meetings where settlement strategies in the *Scanlon* case were discussed. Therefore, the Imperial Palace argued that it was irreparably harmed by Cronin's unauthorized interviews because of the "actual and the potential disclosure of attorney-client and work product disclosures" that occurred during those interviews.

Cronin opposed the motion to disqualify arguing, among other things, that considerations of public policy excused his actions. On March 14, 1989, after a hearing, the district court entered an order granting the motion to disqualify. This proceeding followed.[4]

Cronin contends in his petition that the district court incorrectly determined that he communicated with an adverse party when he spoke with the employees of the Imperial Palace regarding the *Scanlon* case. Cronin asserts that the employees contacted him initially, and that he did not speak with employees of the Imperial Palace who had managing authority for the hotel. Further, he states that none of the employees he interviewed had any authority to control the litigation below. Therefore, Cronin contends that the district court erred in determining that he violated SCR 182 when he interviewed the employees of the Imperial Palace. *See* Wright by Wright v. Group Health Hosp., 691 P.2d 564, 570 (Wash. 1984) (the provisions of DR 7-104(A)(1), the predecessor to SCR 182, did not prohibit a lawyer representing the plaintiff in a medical malpractice action from interviewing, *ex parte,* "nonspeaking/managing agent employees" of the defendant).

The Imperial Palace correctly notes, however, that the *Wright* case interpreted DR 7-104(A)(1). That rule was superseded in Nevada by SCR 182, which states:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

The Nevada Rules of Professional Conduct are taken from the ABA Model Rules of Professional Conduct. *See* SCR 150(1). Although the preamble and comments to the Model Rules were

---

[4]Mandamus is used properly to challenge orders disqualifying attorneys from representing parties in actions that are pending in the district courts. *See* Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982).

not adopted by this court, those materials "may be consulted for guidance in interpreting and applying the Nevada Rules of Professional Conduct, unless there is a conflict between the Nevada Rules and the preamble or comments." SCR 150(2). SCR 182 was taken verbatim from Model Rule 4.2. Comment 2 to the Model Rule 4.2 provides in pertinent part:

> In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization. If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule.
>
> . . .

Initially, we note that the district courts have the responsibility for controlling the conduct of attorneys practicing before them. *See* Trust Corp. of Montana v. Piper Aircraft Corp., 701 F.2d 85 (9th Cir. 1983); Boyd v. Second Judicial District Court, 51 Nev. 264, 274 P. 7 (1929) (district court has inherent power to enjoin an attorney from representing conflicting interests). Further, the district courts have broad discretion in determining whether disqualification is required in a particular case, and that determination will not be disturbed by this court absent a showing of abuse of that discretion. *See* Schloetter v. Railoc of Indiana, Inc., 546 F.2d 706 (7th Cir. 1976). *See also* Collier v. Legakes, 98 Nev. 307, 646 P.2d 1219 (1982) (disqualification of prosecutor's office rests in the discretion of the district court); Round Hill Gen. Imp. Dist. v. Newman, 97 Nev. 601, 637 P.2d 534 (1981) (mandamus will issue to control an arbitrary or capricious exercise of discretion by a district court). Finally, in a situation involving the disqualification of an attorney, any doubt should be resolved in favor of disqualification. *See* Hull v. Celanese Corporation, 513 F.2d 568 (2d Cir. 1975).

Although the district court has wide latitude in determining whether to disqualify counsel from participating in a given case, its discretion in such cases is not unlimited. The district court must balance the prejudices that will inure to the parties as a result of its decision. *See* Shelton v. Hess, 599 F.Supp. 905

(S.D.Tex. 1984). Therefore, to prevail on a motion to disqualify opposing counsel for an alleged ethical violation, the moving party must first establish "at least a reasonable possibility that some specifically identifiable impropriety did in fact occur." *Id.* at 909. Moving counsel must also establish that "the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case." *Id.*

In the present case, it is undisputed that Cronin had repeated and pervasive *ex parte* communications with management level employees of the Imperial Palace to discuss the *Scanlon* case. He met with Mick Shindell twice, Shirley Albury five times and Ed Steffen twice. He received extensive records from the three. Cronin admitted in a deposition that he knew that Mick Shindell was the executive in charge of the security department at the Imperial Palace prior to his first meeting with Shindell. Cronin also admitted in an affidavit filed below that he had interviewed three current *management level employees* of the Imperial Palace. Those documents belie Cronin's statement in this proceeding that he communicated only with "non-speaking/managing" employees of the Imperial Palace. It is clear that Cronin knew that each of the persons he interviewed was a high-ranking employee of the Imperial Palace. Although we do not believe that Cronin intentionally violated SCR 182 when he met with the employees of the Imperial Palace, neither Cronin's negligence nor his ignorance of the rule can justify his conduct. *See* In re Lewelling, 678 P.2d 1229, 1230 (Or. 1984). Thus, the district court was clearly confronted with "at least a reasonable possibility" that a specifically identifiable impropriety did occur.

The second determination, whether the likelihood of public suspicion or obloquy outweighs the social interests that would be served by Cronin's continued participation in the *Scanlon* case, is not as easy as the first. This court has previously characterized as reprehensible the conduct of an attorney who engages in *ex parte* communications with an opposing party who is represented by counsel. *See* Holiday Inn v. Barnett, 103 Nev. 60, 732 P.2d 1376 (1987). As outlined at the beginning of this opinion, however, Cronin was presented with substantial amounts of credible evidence that the Imperial Palace was systematically destroying evidence relevant to the *Scanlon* case. Indeed, if the allegations of wrongdoing by the Imperial Palace contain even a scintilla of truth, public suspicion and obloquy could be fostered by Cronin's

disqualification. We note, however, that by failing to disclose evidence of the Imperial Palace's alleged fraud to the district court at the earliest opportunity, Cronin may have become an unwitting participant in that alleged fraud. In this regard, we note that upon receiving evidence of the alleged fraud, Cronin apparently increased his demand for settlement from $750,000 to $5,000,000. Although this increased settlement demand was undoubtedly prompted by the allegedly improper acts of the Imperial Palace, and was almost certainly in the best interests of the Scanlons, neither a client's interests nor an opponent's conduct justify communication with an adverse party that a lawyer knows is represented by counsel. *See Lewelling,* 678 P.2d at 1230; In re Schwabe, 408 P.2d 922 (Or. 1965).

The disqualification of Cronin may impose a substantial economic penalty on him as the dissent in this case points out. And the real parties in interest may have committed acts more serious than those of Cronin. However, it is our obligation to review and act upon Cronin's conduct, a member of the Nevada Bar. We are not now called upon to determine the violations of the real parties in interest or the penalties that should be imposed upon them. That is initially left to other public officials and courts. Although Cronin was faced with a difficult situation and conflicting loyalties, we cannot overlook conduct that clearly violates the letter and spirit of SCR 182.

Finally, we note that Cronin does not dispute the allegation of the Imperial Palace that prior to meeting Cronin, Mick Shindell was present at meetings with attorneys for the Imperial Palace at which the *Scanlon* case was discussed. This circumstance created a great potential for disclosure of privileged material during Shindell's meetings with Cronin, and thus constitutes another factor that the district court could have used in determining that the nature and extent of Cronin's conduct outweighed the Scanlons' interest in being represented by counsel of their choice. *See Shelton,* 599 F.Supp. at 909.

In light of the above, we conclude that the district court properly balanced the interests of the parties below when it resolved the motion to disqualify Cronin from representing the Scanlons. The circumstances of this case reveal no abuse of discretion by the district court; therefore, we are constrained to deny this petition.[5]

YOUNG, C. J., STEFFEN AND MOWBRAY, JJ., concur.

---

[5]Cause appearing, we deny the parties' respective request for sanctions.

SPRINGER, J., dissenting:

It is alarming to me that Imperial Palace, guilty of the kinds of wrongdoing attributed to its management, should be successful in having Mr. Cronin eliminated as counsel in this case. Imperial Palace claims no prejudice that might result from Mr. Cronin's continuing as counsel in this case and paradoxically must rest its case on the collateral claim of Mr. Cronin's wickedness in violating our rule, SCR 182.

The severance of the attorney-client relationship, the denial to Mr. Cronin's clients of the right to counsel of their choosing, does not seem to me to bear any relationship to what, by all accounts, was at worst an unintentional violation of our rule. Aside from the interests of the clients in this case, it does not seem to me that summary removal of counsel for the plaintiffs in this case is an appropriate penalty to be imposed upon the attorney given even the worst possible interpretation of his conduct in this case.[1]

Rather than sever the attorney-client relationship in this case, thereby punishing both client and attorney, I would simply refer the matter to the Bar. If Mr. Cronin is claimed to be guilty of an unintentional rule violation, it should be dealt with in the same manner as other ethical and disciplinary matters are dealt with. To allow the trial court's order to stand is, to my mind, to permit a great and regrettable injustice to both Mr. Cronin and his clients.

---

[1] We cannot be blind to the fact that removal of Mr. Cronin as counsel in this case will very probably result in a loss to him of fees in the hundreds of thousands of dollars. Such a "fine" is painful indeed as a consequence for Mr. Cronin's receiving information about Imperial Palace's attempt to corrupt the judicial system. Also, it does not seem fair to me that Mr. Cronin should be punished at the behest of Imperial Palace. The wrongdoer goes unpunished; the discoverer of the wrongdoing is punished by being removed from the case. This is not right.