OPINION
 

 Per Curiam:
 

 In this matter, we are asked by the United States Court of Appeals for the Ninth Circuit to answer two certified questions:
 

 1. In applying Supreme Court Rule 182 to an employee of a represented corporation, does Nevada apply the portion of the commentary to Model Rule 4.2 barring ex parte contact with an employee “whose statement may constitute an admission on the part of the organization”?
 

 
 *945
 
 2. If so, does Nevada interpret that portion of the commentary by analogy to Fed. R. Evid. 801(d)(2)(D), by application of agency principles, or by a different analysis?
 

 These questions concern the interpretation of SCR 182, which is based on ABA Model Rule 4.2, as applied to employees of organizational clients. The rule is commonly referred to as the “no-contact” rule.
 

 We note that while the matter has been pending, the comment language at issue was deleted in the 2002 amendments to the ABA Model Rules, and new language was adopted. As we never formally adopted the comments to the Model Rules, we may interpret SCR 182 according to the new version of the comment, the old version of the comment, or some other basis.
 

 We also note that a literal reading of the Ninth Circuit’s questions could yield a result that offers no guidance: if we decide that the language at issue does not apply, then the answer to the first question is “no” and the second question need not be addressed, but the Ninth Circuit would still not know what test Nevada uses in applying SCR 182 to an employee of a represented organization. We therefore rephrase the first question as follows, and delete the second question:
 

 What test does Nevada use in applying Supreme Court Rule 182 to an employee of a represented organization?
 

 The federal district court determined that if an employee’s statement qualifies as a party-opponent admission under FRE 801(d)(2)(D), then contact with the employee falls within SCR 182’s prohibition.
 
 [1]
 
 We conclude that the better test is the “managing-speaking agent” test. We adopt this test, as set forth in this opinion, in determining whether contact with an employee of a represented organization is barred by SCR 182.
 

 FACTS
 

 Dena Palmer applied for work as a waitress at the Pioneer Inn Hotel and Casino in Reno, Nevada. She allegedly also discussed possible positions as a deli food server and a restaurant supervisor with Greg Zamora, Food and Beverage Director. According to Palmer, Zamora told her that she would be hired as a restaurant supervisor, but when she arrived for work, Zamora told her she had been rejected by one of Pioneer’s general managers because she was pregnant. Palmer allegedly told him that she believed this was unlawful discrimination, but Zamora confirmed that she would not be hired.
 

 Pioneer asserted that Palmer was never hired because she did not complete Pioneer’s standard hiring process. This process
 
 *946
 
 begins with an initial screening by Pioneer’s human resources department, followed by an interview with the department for which the applicant wishes to work. At that interview, an offer of employment may be extended, conditional upon completion of the hiring process. Upon acceptance of a conditional offer, the applicant is required to attend an orientation, complete new hire forms, and obtain a police work card. Pioneer argued that since Palmer completed only the first two steps, initial screening and an interview with the appropriate department, she was never actually hired. Palmer essentially maintained that she attempted to complete the hiring process, but was prevented from doing so when Zamora revoked the offer of employment and told her she would not be hired because of her pregnancy.
 

 Pioneer also asserted that only a deli food server position was available at the time Palmer applied, and that Palmer rejected this position because the required hours conflicted with her other job as a waitress at the Olive Garden. According to Pioneer, as no positions for a waitress or restaurant supervisor were available at the time, Palmer could not have been offered these positions. In contrast, Palmer claimed that Zamora gave her the restaurant menus and a pamphlet on supervisor responsibilities to study, and told her the dress code requirements for the position. Palmer alleged that in reliance on the offer of this better position, she quit her job at the Olive Garden and purchased clothing suitable for a supervisor. Additionally, Palmer argued that she would never have quit her job at the Olive Garden if she did not believe that she had been hired.
 

 When Palmer was not hired, she retained counsel almost immediately. Palmer’s attorney informed Pioneer by letter dated February 27, 1997, that he intended to file an action on her behalf. In early March 1997, Palmer lodged a complaint with the Equal Employment Opportunity Commission.
 
 [2]
 
 Pioneer retained counsel to represent it in the matter, and counsel sent a letter to Palmer’s attorney informing him of the representation.
 

 In April 1997, George Kapetanakis, then an executive sous chef at Pioneer,
 
 [3]
 
 contacted Palmer’s attorney. Following their discussion, Kapetanakis signed an affidavit, prepared by Palmer’s attorney, which stated: “during the month of January, 1997, I witnesse[d] Mr. Greg Zamora interviewing . . . [Palmer] .... I inquired of Mr. Zamora whether he intended to hire [her] at
 
 *947
 
 which time Mr. Zamora told me that he had already hired her.” Kapetanakis’s job was a supervisory position that involved running Pioneer’s main kitchen.
 

 Palmer received a right-to-sue letter from the EEOC. On July 9, 1997, Palmer filed an action in federal court alleging pregnancy and gender discrimination under Title VII,
 
 [4]
 
 and pendent state law claims.
 

 Pioneer moved to disqualify Palmer’s counsel under SCR 182 based on his ex parte contact with Kapetanakis.
 
 [5]
 
 The federal magistrate judge found that Kapetanakis was a supervisor who had responsibility for interviewing and hiring cooks, dishwashers, and sous chefs, although not waitresses, servers, or restaurant supervisors. The magistrate concluded that, even though Kapetanakis was not involved in hiring waitresses, food servers, or restaurant supervisors (any of the positions Palmer claims to have discussed with Zamora), “[bjecause his job responsibilities included hiring employees, he was in a position to make statements concerning the hiring policies of Pioneer.” The magistrate then held that counsel’s contact with Kapetanakis constituted ex parte contact with a represented party under SCR 182, and sanctioned counsel by excluding the affidavit obtained by the contact, precluding Kapetanakis from testifying about the information contained in the affidavit, and awarding fees and costs of $2,800 to Pioneer. After Palmer filed an objection, the federal district court affirmed the magistrate’s order in its entirety.
 

 Before trial, the district court dismissed two of Palmer’s claims on summary judgment. At trial, the jury found for Pioneer. Palmer appealed the summary judgment, certain rulings at trial, and the order imposing sanctions for her counsel’s ex parte contact. The questions certified by the Ninth Circuit concern only the sanctions order.
 

 DISCUSSION
 

 SCR 182, Model Rule 4.2 and Comments
 

 SCR 182 provides:
 

 In representing a client, a lawyer shall not communicate about the subject of the representation with a party the
 
 *948
 
 lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
 

 This rule was adopted verbatim from the original version of ABA Model Rule 4.2,
 
 [6]
 
 which in turn was copied almost verbatim from Model Code of Professional Responsibility DR 7-104(A)(l). Before that, the same general concept was contained in Canon 9 of the ABA Canons of Professional Ethics.
 
 [7]
 

 The primary purpose of the rule is to protect the attorney-client relationship from intrusion by opposing counsel.
 
 [8]
 
 It protects parties from unprincipled attorneys and safeguards the attorney-client privilege. It also promotes counsel’s effective representation of a client by routing communication with the other side through counsel, who can present the information in a way most favorable to the client.
 
 [9]
 
 Sanctions for violating the rule have included disqualification of counsel, monetary sanctions, exclusion of information obtained by ex parte contact, prohibition on the use of such information at trial, and production to the organization’s counsel of information obtained by ex parte contact, including all or part of the work product connected with the contact.
 
 [10]
 

 The rule’s protections undisputedly extend to organizational parties, who must act through their directors and employees.
 
 [11]
 
 Accordingly, at least some of the organization’s agents must be viewed as the equivalent of a “party” for the rule to have any effect.
 
 [12]
 
 A conflict between policies arises, however. On one hand,
 
 *949
 
 the rule’s protective purposes are best served by defining this pool of agents broadly. On the other hand, defining the pool more narrowly fosters the use of informal discovery methods, which further the prompt and cost-effective resolution of disputes. Moreover, a narrower definition affords a reasonable opportunity for pre-litigation investigation under Rule 11.
 
 [13]
 
 The question then becomes how to apply the rule in a way that best balances the competing policies.
 

 The ABA has attempted to provide some guidance in this area in its comments to the Model Rules. SCR 150(2) explains that the comments to the ABA Model Rules were not adopted by this court, but can be consulted for guidance. In our two published opinions on SCR 182, we have considered the comments, as they stood at the time of those decisions, in interpreting the rule. In
 
 Cronin v. District
 
 Court,
 
 [14]
 
 we followed a portion of the 1983 comments providing that communications with managerial-level employees of a corporate client are included within SCR 182’s scope. In the other case,
 
 In re Discipline of Schaefer,
 

 [15]
 

 we rejected a portion of the 1995 comments that suggested that a lawyer representing himself in a matter was not included within the rule’s scope.
 

 The pertinent part of the 1995 comments to Model Rule 4.2, in effect at the time of the federal district court’s decision and the Ninth Circuit’s certification order,
 
 [16]
 
 is as follows, with emphasis added:
 

 In the case of an organization, this Rule prohibits communications by a lawyer for another person or entity concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with
 
 any other person
 
 whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or
 
 whose statement may constitute an admission on the part of the organization.
 
 If an agent or employee of the organization is represented in the matter by
 
 *950
 
 his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f) [concerning propriety of a lawyer’s request that a person other than a client refrain from voluntarily giving information].
 
 [17]
 

 As noted above, the emphasized portion of the comment is at issue in this case.
 

 The comments to Model Rule 4.2 were substantially revised in the 2002 amendments to the Model Rules,
 
 [18]
 
 well after the conduct in this case took place, and after the certification order was entered. While they were available in draft form at the time of the certification order and when the parties filed their briefs with this court, they had not yet been approved. As amended, the pertinent comment reads:
 

 In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization’s lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability. Consent of the organization’s lawyer is not required for communication with a former constituent. If a constituent of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). In communicating with a current or former constituent of an organization, a lawyer must not use methods of obtaining evidence that violate the legal rights of the organization. See Rule 4.4.
 
 [19]
 

 The amendment deletes the portion of the earlier comment at issue in this matter. According to the Ethics 2000 Commission’s Report overview, the amendments to Rule 4.2 were part of the commission’s effort to “[c]larif[y] existing rules and Comment to
 
 *951
 
 provide better guidance and explanation to lawyers,” specifically, to “clarif[y] application of the Rule to organizational clients.”
 
 [20]
 
 In particular, the Reporter’s Explanation of Changes states that the “admission” clause was deleted because it had been misapplied to situations when an employee’s statement could be admissible against the organizational employer, when the clause was only ever intended to encompass those few jurisdictions with a law of evidence providing that statements by certain employees of an organization were not only admissible against the organization but could not thereafter be controverted by the organization.
 
 [21]
 

 The recent amendments, and the reasons for them, are relevant to our consideration of the issue, particularly because the former comment was never binding on Nevada lawyers, and so retroac-tivity is not a concern.
 

 Various tests for determining which employees are included within the rule’s scope
 

 Many competing policies must be considered when deciding how to interpret the no-contact rule as applied to organizational clients: protecting the attorney-client relationship from interference; protecting represented parties from overreaching by opposing lawyers; protecting against the inadvertent disclosure of privileged information; balancing on one hand an organization’s need to act through agents and employees, and protecting those employees from overreaching and the organization from the inadvertent disclosure of privileged information, and on the other hand the lack of any such protection afforded an individual, whose friends, relatives, acquaintances and co-workers may generally all be contacted freely; permitting more equitable and affordable access to information pertinent to a legal dispute; promoting the court system’s efficiency by allowing investigation before litigation and informal information-gathering during litigation; permitting a plaintiff’s attorney sufficient opportunity to adequately investigate a claim before filing a complaint in accordance with Rule 11; and enhancing the court’s truth-finding role by permitting contact with potential witnesses in a manner that allows them to speak freely.
 

 Various courts have formulated several tests for determining who is encompassed within the no-contact rule. Most of the tests attempt to interpret the former comment to Model Rule 4.2. At one extreme is the “blanket” test, which prohibits contact with
 
 *952
 
 current and former employees of an organizational client; at the other is the “control group” test, which covers only high-level management employees. Several tests fall in the middle, including a party-opponent admission test, a case-by-case balancing test, and a “managing-speaking agent” test. Finally, a test crafted by the New York Court of Appeals expressly disclaims any reliance on the former comment, but is admittedly based on the “managing-speaking agent” test.
 

 Blanket test
 

 The blanket test prohibits all contact, and appears to have been adopted in very few published decisions. A federal district court has concluded that a blanket rule prohibiting all contact sets a bright-line rule that is easily followed and enforced.
 
 [22]
 
 That court also opined that depositions were more “reliable and ethically sound” than informal interviews.
 
 [23]
 

 The primary advantage of this test is its clarity: no employees of a represented organization may be contacted by opposing counsel. It also offers the most protection for the organization. The cost of these advantages, however, is very high. A complete prohibition on informal ex parte contact greatly limits, if not eliminates, counsel’s opportunity to properly investigate a potential claim before a complaint is filed, as required by Rule 11. Also, the rules of civil procedure, especially the discovery rules, are designed to afford parties broad access to information, and informal interviews are a cost-effective way of gathering facts, as opposed to more expensive depositions, which preserve facts.
 
 [24]
 

 Party-opponent admission test
 

 The test based on the hearsay rule appears to encompass almost as many employees as the blanket test, and is the test adopted by the federal district court in this matter. This test encompasses within the ethical rule any employee whose statement might be admissible as a party-opponent admission under FRE 801(d)(2)(D)
 
 *953
 
 and its state counterparts.
 
 [25]
 
 According to the evidence rule, an employee’s statement is not hearsay, and thus is freely admissible against the employer, if it concerns a matter within the scope of the employee’s employment, and is made during the employee’s period of employment.
 

 The courts adopting the party-opponent admission test have concluded that the former comment’s reference to “admissions” was clearly meant to incorporate the rules of evidence governing admissions. In
 
 Brown v. St. Joseph County,
 

 [26]
 

 an Indiana federal district court quoted a leading treatise in reasoning that the evi-dentiary test gave ‘“a sound practical cast to the rule: those who can hurt or bind the organization
 
 with respect to the matter at hand
 
 are off limits except for formal discovery or except with the consent of the entity’s lawyer.’ ’ ’
 

 This test’s primary advantage is that it protects the organization from potentially harmful admissions made by its employees to opposing counsel, without the organization’s counsel’s presence. The organization’s interest in this regard is particularly strong because such admissions are generally recognized as a very persuasive form of evidence.
 
 [27]
 

 The drawback of this test is that it essentially covers all or almost all employees, since any employee could make statements concerning a matter within the scope of his or her employment, and thus could potentially be included within the rule.
 
 [28]
 
 Thus, the party-opponent admission test can effectively serve as a blanket test, thus frustrating the search for truth.
 
 [29]
 
 An attorney attempting to comply with Rule ll’s requirements would be faced with two unenviable choices. The first option would be not to contact persons who might be the best, if not the only, source of corroborating information. This option would ensure that the attorney complies with SCR 182’s prohibitions, but would result in the attorney’s failure to comply with Rule 11. The second option
 
 *954
 
 would be for the attorney to second-guess what an employee might say, in an attempt to determine whether contact might be permissible, which would result in the attorney risking an SCR 182 violation.
 
 [30]
 

 In addition, a party admission may be challenged through impeachment of the witness, by presenting contradictory evidence, or by explaining the admission.
 
 [31]
 
 Accordingly, it is not clear that this test properly balances the competing policies.
 

 Managing-speaking agent test
 

 The managing-speaking agent test appears to have evolved before the tests discussed above, in response to a United States Supreme Court case discussing the scope of the attorney-client privilege as applied to an organizational client. In
 
 Upjohn Co. v. United
 
 States,
 
 [32]
 
 the Court held that the privilege was not restricted to an organization’s “control group.” Rather, the Court held that mid- and even low-level employees could have information necessary to defend against a potential claim, and thus communications between such employees and counsel were protected by the privilege. While acknowledging that the
 
 Upjohn
 
 opinion did not expressly apply to the no-contact rule, the courts adopting the managing-speaking agent test in Upjohn’s wake reasoned that the protection afforded an organization under the no-contact rule should be commensurate with that afforded by the attorney-client privilege.
 
 [33]
 
 At the same time, relying on dicta in
 
 Upjohn
 
 stating that confidential communications, not facts, were entitled to protection, these courts determined that the rule should not be expanded so broadly that informal investigation through ex parte interviews was restricted too severely.
 

 Some courts adopting this test have done so without reference to Model Rule 4.2’s former comment, which includes three categories of employees: those with managerial responsibility, those whose acts or omissions could be imputed to the’ organization to establish liability, or those whose statements could constitute an admission by the organization.
 
 [34]
 
 Other courts applied the former
 
 *955
 
 comment in determining that the test best interpreted one or more categories of employees listed in the former comment.
 
 [35]
 
 No court appears to have adopted precisely the same statement of the test.
 
 [36]
 

 In all of its formulations, the managing-speaking agent test restricts contact with those employees who have “speaking” authority for the organization, that is, those with legal authority to bind the organization.
 
 [37]
 
 Which employees have “speaking” authority is determined on a case-by-case basis according to the particular employee’s position and duties and the jurisdiction’s agency and evidence law. This is the essence of the test as set forth in the most-cited case adopting it, the Washington Supreme Court’s opinion in
 
 Wright by Wright v. Group Health
 
 Hospital.
 
 [38]
 

 Beyond this common factor, the test has sometimes included other employees. For example, in jurisdictions with an evidence rule similar to FRE 801(d)(2)(D), courts have applied the evidence rule in determining which employees “speak” for the organization, thus yielding a result similar to the party-opponent admission test.
 
 [39]
 
 Also, some courts have used this test to interpret one or another of the categories in Model Rule 4.2’s former comment, but have also referred to the other categories, including those employees whose conduct could be imputed to the organization.
 
 [40]
 

 Courts adopting this test have concluded that it best balances the competing policies of protecting the organizational client from overreaching by opposing counsel through direct contact with its employees and agents, and the adverse attorney’s need for information in the organization’s exclusive possession that
 
 *956
 
 may be too expensive or impractical to obtain through formal discovery.
 
 [41]
 
 They also note, relying on Upjohn’s dicta, that the rule’s purpose is not to protect an organization from the revelation of prejudicial facts, thus disapproving of the party-opponent admission test.
 
 [42]
 

 The test’s primary drawback is its lack of predictability.
 
 [43]
 
 As noted above, several of the courts purporting to adopt the test have stated and applied it very differently. In addition, because the test relies on a particular jurisdiction’s agency and evidence law, its application may yield divergent results.
 

 Control group test
 

 The final test that interprets the former comment to the rule is the “control group” test. This test encompasses only those top management level employees who have responsibility for making final decisions, and those employees whose advisory roles to top management indicate that a decision would not normally be made without those employees’ advice or opinion.
 
 [44]
 

 This test serves the policies of preserving the availability of witnesses, reducing discovery costs by permitting informal interviews of a broad range of employees, and affording the best opportunity for pre-litigation fact investigation.
 
 [45]
 
 The test has become disfavored following the
 
 Upjohn
 
 decision, because the control group test is narrower than the attorney-client privilege rule approved in that case.
 
 [46]
 
 Also, it lacks predictability because it is not always clear which employees fall within the “control group.”
 
 [47]
 

 Case-by-case balancing test
 

 A few courts have adopted a case-by-case balancing approach.
 
 [48]
 
 Under this test, the particular facts of the case must be examined to determine what informal contacts may be appropriate in light
 
 *957
 
 of the parties’ specific needs. Factors to be considered are the claims asserted, the employee’s position and duties, the employer’s interests in protecting itself, and the alternatives available to the party seeking an informal interview.
 
 [49]
 
 Results under the test have varied.
 
 [50]
 
 The pertinent cases do not address counsel’s difficulty in applying this test before an actual interview, to determine whether the interview might later be found to be a rule violation. Rather, it appears that this test has been applied only when a lawyer seeks prospective guidance from a court, and it has not been used in making an after-the-fact determination of whether an attorney has violated the ethical rule. While this approach offers a fact-specific application of the no-contact rule and has some practical appeal in those situations when counsel seeks court guidance before making an ex parte contact, it is not at all predictable and does not have a sound analytical basis. Also, ex parte contact is most useful and necessary in the pre-litigation stage, when counsel is complying with his or her Rule 11 obligation to investigate whether a valid claim exists. A test that requires court intervention before contact may be made does not further the purpose of permitting an adequate investigation under Rule 11. Accordingly, while the balancing approach may be useful in certain limited situations, it cannot feasibly be applied as a universal standard for interpreting SCR 182.
 

 New York test
 

 Finally, an additional test has been formulated by the New York Court of Appeals in
 
 Niesig v. Team I,
 

 [51]
 

 which explicitly rejects reliance on the former comment. The test is often referred to as the “alter ego” test.
 
 [52]
 
 The court rejected the blanket test as too broad, and the control group test as too narrow. It also expressed dissatisfaction with the existing intermediate tests, because they were too uncertain in application. Instead, while acknowledging that any non-blanket rule engendered some uncertainty, the court formulated its own test:
 

 
 *958
 
 The test that best balances the competing interests, and incorporates the most desirable elements of the other approaches, is one that defines “party” to include corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation’s “alter egos”) or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel. All other employees may be interviewed informally.
 
 [53]
 

 In particular, the court noted that its test “would clearly permit direct access to employees who were merely witnesses to an event for which the corporate employer is sued.”
 
 [54]
 
 This test has since been adopted by several courts.
 
 [55]
 

 One advantage of the New York test is that it balances the protection afforded to the organization with the need for informal investigation, although it may go too far in protecting the organization by including those employees whose conduct may be imputed to the organization. Its disadvantage, as admitted by the
 
 Niesig
 
 court, is that any non-blanket rule has an element of unpredictability, and so in close situations it may be difficult to determine whether a particular employee is within its scope. In particular, as with the managing-speaking agent test on which the New York test is based, it may be difficult to determine which employees have sufficient authority to “bind” the organization.
 

 The arguments of the parties and amici
 

 Palmer first argues that the “admission” clause of the former comment should not be followed.
 
 [56]
 
 She contends that it is difficult for an attorney who is attempting to comply with Rule 11 while not violating ethical rules. According to Palmer, the former comment thus chills proper representation of clients against an organizational opponent. Instead, Palmer advocates the New York test. In the event this court decides to apply the “admission” clause, Palmer argues that the party-opponent admission test relied upon by the district court is too broad, and that the managing-speaking agent test should be adopted.
 

 
 *959
 
 Pioneer argues that this court should apply the “admission” clause, and relies on this court’s citation to the comments generally in
 
 Cronin
 
 and
 
 Schaefer.
 

 [57]
 

 Pioneer further argues that the federal district court appropriately applied the party-opponent admission test, because any other test renders the “admission” clause superfluous.
 

 Pioneer also relies on the
 
 Restatement (Third) of the Law Governing Lawyers,
 
 which provides that attorneys are prohibited from contacting employees whose statements “would have the effect of binding the organization with respect to proof of the matter.”
 
 [58]
 
 Pioneer argues that this language is the same as applying the party-opponent admission test to interpret the “admission” clause.
 

 The
 
 Restatement
 
 is considerably narrower, however, because the party-opponent admission test does not bind the organization to the admission — while the admission is admissible, the organization is free to offer evidence contradicting the admission and/or impeaching the party who made it.
 
 [59]
 
 The comments to the
 
 Restatement
 
 itself indicate that it in no way advocates a standard based on the party-opponent admission rule, but rather that its proposed rule follows the New York approach.
 
 [60]
 

 In its amicus brief, the Nevada Trial Lawyers Association argues that the “admission” clause should not be followed, and cites heavily to the Ethics 2000 Commission’s reports and drafts.
 
 [61]
 
 In the event this court decides to follow the “admission” clause, the NTLA essentially repeats Palmer’s arguments that a managing-speaking agent test should be adopted rather than the party-opponent admission test.
 

 Finally, in its amicus brief, the state bar recommends that the “admission” clause be rejected, and that we adopt the test crafted by the New York Court of Appeals. The state bar strongly argues that the policies behind the rule are best served by the New York test. In a final paragraph, the state bar recommends that in the event this court applies the “admission” clause, the managing-speaking agent test would be preferable.
 

 
 *960
 

 Analysis
 

 We conclude that the managing-speaking agent test, as set forth below, best balances the policies at stake when considering what contact with an organization’s representatives is appropriate. The test protects from overbearance by opposing counsel those.representatives who are in a position to speak for and bind the organization during the course of litigation, while still providing ample opportunity for an adequate Rule 11 investigation.
 

 In addition, we conclude that the United States Supreme Court’s reasoning in
 
 Upjohn,
 
 while explicitly addressing only the attorney-client privilege, applies with equal force to the no-contact rule, in that the purpose of SCR 182 is to protect the attorney-client relationship, not to protect an organization from the discovery of adverse facts.
 
 [62]
 
 The managing-speaking agent test best fulfills this purpose by not being over-inclusive. In particular, the managing-speaking agent test adopted by this court does not protect the organization at the expense of the justice system’s truth-finding function by including employees whose conduct could be imputed to the organization based simply on the doctrine of respondeat superior. Finally, while any non-blanket rule has some uncertainty, we conclude that the test is sufficiently clear to provide significant guidance to counsel.
 
 [63]
 

 In embracing the managing-speaking agent test, we do not adopt Model Rule 4.2’s former comment. Also, we do not follow the 2002 comment, which essentially tracks the New York test. Rather, SCR 182 should be interpreted according to the managing-speaking agent test as set forth by the Washington Supreme Court in
 
 Wright by Wright v. Group Health
 
 Hospital:
 
 [64]
 

 [T]he best interpretation of “party” in litigation involving corporations is only those employees who have the legal authority to “bind” the corporation in a legal evidentiary sense,
 
 i.e.,
 
 those employees who have “speaking authority” for the corporation. ... It is not the purpose of the rule to protect a corporate party from the revelation of prejudicial facts. Rather, the rule’s function is to preclude the interviewing of those corporate employees who have the authority to
 
 bind
 
 the corporation.
 

 
 *961
 
 . . . [E]mployees should be considered “parties” for the purposes of the disciplinary rule if, under applicable [state] law, they have managing authority sufficient to give them the right to speak for, and bind, the corporation.
 

 In applying this test, we specifically note that an employee does not “speak for” the organization simply because his or her statement may be admissible as a party-opponent admission. Rather, the inquiry is whether the employee can bind the organization with his or her statement. Also, an employee for whom counsel has not been retained does not become a “represented party” simply because his or her conduct may be imputed to the organization; while any confidential communications between such an employee and the organization’s counsel would be protected by the attorney-client privilege, the facts within that employee’s knowledge are generally not protected from revelation through ex parte interviews by opposing counsel.
 
 [65]
 

 A lawyer must have a reasonable opportunity to conduct an investigation under Rule 11. This investigation would be unduly hampered by an over-inclusive test, such as the party-opponent admission test adopted by the federal district court in this case. Such a test essentially bars contact with all employees, because any employee could make a statement concerning a matter within the scope of his or her employment, which would then be admissible under FRE 801(d)(2)(D) or a state equivalent. A lawyer contacting the employee could not know in advance whether the employee might make such a statement, and so would be forced to choose between foregoing information that could be useful and even necessary to a proper investigation, or risking sanctions for an SCR 182 violation. Without doubt, an organization is entitled to the protections afforded by SCR 182, but just as for individuals, this protection is not unlimited. The managing-speaking agent test most appropriately balances these competing interests, and so it is the test we adopt.
 

 CONCLUSION
 

 Nevada does not follow the portion of the ABA Model Rule 4.2’s former comment providing that contact is barred with an organization’s employee whose admission may constitute an admission on the part of the organization, nor does it follow the 2002 version of the comment. Rather, in interpreting SCR 182 as
 
 *962
 
 applied to employees of an organization, we adopt the managing-speaking agent test. This test preserves the protection afforded by SCR 182 to an organization, while permitting sufficient flexibility to conduct an adequate pre-litigation investigation.
 

 [1]
 

 Palmer v. Pioneer Hotel & Casino,
 
 19 F. Supp. 2d 1157 (D. Nev. 1998).
 

 [2]
 

 The record does not reflect that Palmer filed a complaint with the Nevada Equal Rights Commission — only the EEOC complaint is mentioned.
 

 [3]
 

 It appears from the record that Kapetanakis later left Pioneer’s employ, under hostile circumstances apparently arising out of a workers’ compensation dispute.
 

 [4]
 

 42 U.S.C. §§ 2000e to 2000e-17 (1994).
 

 [5]
 

 Palmer’s counsel also contacted one other current employee and two former employees. Jennifer Walker, the current employee, was a telephone operator, a non-supervisory position. The two former employees were Sarah Favero, an “on-call” banquet worker, and Donna Lorenz, who was Food and Beverage Director before Zamora. The federal district court found that counsel’s contact with these individuals was not a violation of SCR 182, and so they are not discussed in the Ninth Circuit’s order or this opinion.
 

 [6]
 

 See
 
 SCR 150(1); Model Rules of Prof'l Conduct R. 4.2 (1983). Model Rule 4.2 was amended in 1995 to replace the word “party” with “person,” to clarify that communications occurring before litigation but after a dispute had arisen were encompassed within the rule.
 
 See
 
 Model Rules of Prof’l Conduct R. 4.2 (1995); 2 Geoffrey C. Hazard, Jr. & W. William Hodes,
 
 The Law of Lawyering
 
 § 38.2 (2001). Nevada has never adopted this amendment. Model Rule 4.2 and its comments were amended in early 2002, when the ABA House of Delegates approved proposed changes to the rules based on the Ethics 2000 Commission report.
 
 See Ethics 2000 Commission, at
 
 http://abanet.org/cpr/e2k-report_home.html (2002). The 2002 amendments are discussed
 
 infra.
 

 [7]
 

 Felicia Ruth Reid, Comment,
 
 Ethical Limitations on Investigating Employment Discrimination Claims: The Prohibition on Ex Parte Contact with a Defendant’s Employees,
 
 24 U.C. Davis L. Rev. 1243, 1249 (1991).
 

 [8]
 

 Id.
 
 at 1250;
 
 see also
 
 ABA Center for Professional Responsibility,
 
 Annotated Model Rules of Professional Conduct
 
 398 (4th ed. 1999); Thomas W. Biggar,
 
 Discovery and Ethics: Dilemma in Interviewing Corporate Employees,
 
 1 Nev L. Rev. 1, 5 (1998).
 

 [9]
 

 Reid,
 
 supra
 
 note 7, at 1250-51.
 

 [10]
 

 Biggar,
 
 supra
 
 note 8, at 4-5.
 

 [11]
 

 Id.
 
 at 2.
 

 [12]
 

 Id.
 
 at 1-2.
 

 [13]
 

 Reid,
 
 supra
 
 note 7, at 1252-53; Biggar,
 
 supra
 
 note 8, at 6;
 
 see also
 
 NRCP 11; Fed. R. Civ. R 11. Inasmuch as the duties imposed by the Nevada and federal versions of the rule are substantially the same, any reference in this opinion to “Rule 11” means both the federal and Nevada rules.
 

 [14]
 

 105 Nev. 635, 781 P.2d 1150 (1989).
 

 [15]
 

 117 Nev. 496, 25 P.3d 191,
 
 as modified.
 
 31 P.3d 365 (2001),
 
 cert. denied,
 
 534 U.S. 1131 (2002).
 

 [16]
 

 In the original 1983 version, this text was designated as Comment 2. In the 1995 revisions, it was renumbered Comment 4, but the text did not change. In the 2002 revisions, it was renumbered Comment 7, and the text was changed substantially, as discussed in this opinion.
 

 [17]
 

 Model Rules of Prof 1 Conduct R. 4.2 cmt. 4 (1995).
 

 [18]
 

 Model Rule 4.2 received only a minor change, to clarify that a court may permit or prohibit contact in a particular case. The change reflects actual practice under the former version of the rule. As amended in 2002, Model Rule 4.2 reads as follows (the added language is emphasized):
 

 In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law
 
 or a court order.
 

 Model Rules of Prof'l Conduct R. 4.2 (2002).
 

 [19]
 

 Id.
 
 R. 4.2 cmt. 7.
 

 [20]
 

 Charlotte Stretch,
 
 Overview of Ethics 2000 Commission and Report, at
 
 http://abanet.org/cpr/e2k-ov_mar02.doc (2002).
 

 [21]
 

 See Model Rule 4.2
 
 — Reporter’s
 
 Explanation of Changes, at
 
 http://www.abanet.org/cpr/rule42memo.html (Feb. 21, 2000).
 

 [22]
 

 Public Serv. Elec. & Gas v. Associated Elec. & Gas,
 
 745 F. Supp. 1037 (D.N.J. 1990),
 
 superseded by rule amendment as recognized in Klier v. Sordoni Skanska Const. Co., 166
 
 A.2d 761 (N.J. Super. Ct. App. Div. 2001) (incorporating control group test in text of rule as amended);
 
 see also
 
 Louis A. Stahl,
 
 Ex Parte Interviews with Enterprise Employees: A
 
 Post-Upjohn
 
 Analysis,
 
 44 Wash. & Lee L. Rev. 1181, 1196 (1987) (concluding that a blanket rule best serves the purpose of the no-contact rule: to provide effective representation to the client).
 

 [23]
 

 Public Serv. Elec.,
 
 745 F. Supp. at 1043.
 

 [24]
 

 Biggar,
 
 supra
 
 note 8, at 6 (stating that SCR 182 “is an ethical rule, not a rule through which corporate parties should gain the ability to control the flow of information to their adversaries”).
 

 [25]
 

 See Cole v. Appalachian Power Co.,
 
 903 F. Supp. 975 (S.D.W. Va. 1995);
 
 Brown
 
 v.
 
 St. Joseph County,
 
 148 F.R.D. 246 (N.D. Ind. 1993);
 
 University Patents, Inc. v. Kligman,
 
 737 F. Supp. 325 (E.D. Pa. 1990);
 
 see also Weeks
 
 v.
 
 Independent School Dist. No. I-89,
 
 230 F.3d 1201 (10th Cir. 2000) (purporting to adopt the managing-speaking test, but applying FRE 801(d)(2)(D) to determine which employees “speak” for the university),
 
 cert. denied,
 
 532 U.S. 1020 (2001);
 
 id.
 
 at 1214-15 (Briscoe, J., concurring) (identifying the inconsistency in the majority’s analysis, and explicitly basing his concurrence on FRE 801(d)(2)(D));
 
 see also
 
 NRS 51.035(3)(d) (mirroring FRE 801(d)(2)(D)).
 

 [26]
 

 148 F.R.D. at 254 (quoting 2 Hazard & Hodes,
 
 supra
 
 note 6, § 38.6, at 38-9).
 

 [27]
 

 Reid,
 
 supra
 
 note 7, at 1274.
 

 [28]
 

 Id.
 
 at
 
 1211.
 

 [29]
 

 Biggar,
 
 supra
 
 note 8, at 15.
 

 [30]
 

 Id.
 
 at 3-4.
 

 [31]
 

 Reid,
 
 supra
 
 note 7, at 1278;
 
 see also Chaffee v. Kraft General Foods, Inc.,
 
 886 F. Supp. 1164 (D.N.J. 1995) (explaining the difference between a judicial admission, which is conclusively binding, and an evidentiary party admission, which may be challenged);
 
 In re Applin,
 
 108 B.R. 253 (Bankr. E.D. Cal. 1989) (same).
 

 [32]
 

 449 U.S. 383 (1981).
 

 [33]
 

 See Chancellor v. Boeing Co.,
 
 678 F. Supp. 250 (D. Kan. 1988);
 
 Wright by Wright v. Group Health Hosp.,
 
 691 R2d 564 (Wash. 1984).
 

 [34]
 

 See Wright,
 
 691 P.2d 564; Model Rules of Prof'l Conduct R. 4.2 cmt. 4 (1995).
 

 [35]
 

 See Chancellor v. Boeing Co.,
 
 678 F. Supp. 250 (D. Kan. 1988) (applying test to “admission” category);
 
 Palmer v. Pioneer Hotel & Casino,
 
 19 F. Supp. 2d 1157 (D. Nev. 1998) (applying test to more clearly define former comment’s “managerial” category, but reasoning that other categories of former comment still apply).
 

 [36]
 

 Compare Weeks
 
 v.
 
 Independent School Dist. No. I-89,
 
 230 F.3d 1201 (10th Cir. 2000) (purporting to adopt the managing-speaking test, but applying FRE 801(d)(2)(D) to determine which employees “speak” for the university), cer
 
 t. denied,
 
 532 U.S. 1020 (2001),
 
 and Chancellor,
 
 678 F. Supp. 250 (implying that evidentiary rules determine which employees have “speaking” authority),
 
 with Wright,
 
 691 P.2d 564 (emphasizing that only employees who could “bind” the organization are covered),
 
 and Porter
 
 v.
 
 Arco Metals, Div. of Atlantic Richfield,
 
 642 F. Supp. 1116 (D. Mont. 1986) (relying on
 
 Wright
 
 but stating the test differently).
 

 [37]
 

 See Chancellor,
 
 678 F. Supp. at 253;
 
 Porter,
 
 642 F. Supp. at 1118;
 
 Wright,
 
 691 P.2d at 569.
 

 [38]
 

 691 P.2d 564.
 

 [39]
 

 See
 
 Weeks,
 
 230 F.3d 1201;
 
 Chancellor,
 
 678 F. Supp. 250.
 

 [40]
 

 See Chancellor,
 
 678 F. Supp. 250;
 
 Palmer,
 
 19 F. Supp. 2d 1157.
 

 [41]
 

 See Wright,
 
 691 P.2d at 569;
 
 see also
 
 Reid,
 
 supra
 
 note 7, at 1289-90.
 

 [42]
 

 Wright,
 
 691 P.2d at 569.
 

 [43]
 

 Reid,
 
 supra
 
 note 7, at 1291; Biggar,
 
 supra
 
 note 8, at 12.
 

 [44]
 

 See Fair Automotive v. Car-X Service Systems,
 
 471 N.E.2d 554, 560 (Ill. App. Ct. 1984).
 

 [45]
 

 Reid,
 
 supra
 
 note 7, at 1286.
 

 [46]
 

 Id.
 
 at 1286-87.
 

 [47]
 

 Id.
 
 at 1287.
 

 [48]
 

 See Erickson
 
 v.
 
 Winthrop Laboratories,
 
 592 A.2d 33 (N.J. Super. Ct. Law Div. 1991),
 
 superseded by rule amendment as recognized in Klier v. Sordoni Skanska Const. Co.,
 
 766 A.2d 761 (N.J. Super. Ct. App. Div. 2001) (incorporating control group test in text of rule as amended);
 
 Baisley v. Missisquoi Cemetety Ass’n,
 
 708 A.2d 924 (Vt. 1998) (purporting not to choose between balancing test and New York test, but applying balancing test).
 

 [49]
 

 See
 
 Baisley,
 
 708 A.2d at 933.
 

 [50]
 

 Compare Morrison v. Brandeis University,
 
 125 F.R.D. 14 (D. Mass. 1989) (permitting ex parte contact by counsel for the plaintiff professor, who was denied tenure, with professors sitting on the plaintiff’s peer review panel; such contact would appear to be prohibited under every other test),
 
 with Baisley,
 
 708 A.2d at 933 (prohibiting ex parte contact with a cemetery caretaker in a case seeking damages for injuries suffered by the plaintiffs’ child when he fell upon a spiked fence surrounding the cemetery; such contact would appear to be permissible under most of the other tests).
 

 [51]
 

 558 N.E.2d 1030 (N.Y. 1990).
 

 [52]
 

 Reid,
 
 supra
 
 note 7, at 1293.
 

 [53]
 

 Id.
 
 at 1035.
 

 [54]
 

 Id.
 
 at 1035-36.
 

 [55]
 

 See Strawser
 
 v.
 
 Exxon Co., U.S.A.,
 
 843 P.2d 613 (Wyo. 1992);
 
 State
 
 v.
 
 CIBA-GEIGY Corp.,
 
 589 A.2d 180 (N.J. Super. Ct. App. Div. 1991);
 
 Dent
 
 v.
 
 Kaufman,
 
 406 S.E.2d 68, 72 (W. Va. 1991);
 
 MR & W
 
 v.
 
 President and Fellows of Harvard, 764
 
 N.E.2d 825 (Mass. 2002);
 
 Bougé v. Smith's Management Corp.,
 
 132 F.R.D. 560 (D. Utah 1990).
 

 [56]
 

 Although the comment has since been amended, we could still conclude that it contains the best statement of which employees should be covered; accordingly, the issue is not moot.
 

 [57]
 

 Although Pioneer argues that our
 
 Schaefer
 
 opinion supports application of the former comment, and Palmer concedes that
 
 Schaefer,
 
 together with
 
 Cronin,
 
 may lead us to conclude that we have adopted the former comment, including the “admission” clause, we actually rejected the portion of the comment addressed in
 
 Schaefer. See
 
 117 Nev. at 507-08, 25 P.3d at 199-200.
 

 [58]
 

 Restatement (Third) of the Law Governing Lawyers
 
 § 100 (2000).
 

 [59]
 

 See, e.g., Chaffee,
 
 886 F. Supp. 1164;
 
 Applin,
 
 108 B.R. 253.
 

 [60]
 

 Restatement, supra
 
 note 58, § 100 cmt. e.
 

 [61]
 

 The NTLA’s brief was filed in September 2001, before the amendments were formally adopted.
 

 [62]
 

 See
 
 Upjohn,
 
 449 U.S. at 395-96.
 

 [63]
 

 See Biggar,
 
 supra
 
 note 8, at 22 (noting that while ethical rules provide few bright lines, attorneys, who must have a certain level of education, trai-ing, and common sense, can survive without them by being aware of when to seek further guidance and what possible consequences may attach to questionable actions).
 

 [64]
 

 691 P.2d 564, 569 (Wash. 1984) (citations omitted).
 

 [65]
 

 See Upjohn,
 
 449 U.S. at 395-96. We note that an attorney who abuses the interview process by inquiring into privileged matters, or even by permitting an employee to refer to confidential communications without immediately warning the employee that such communications are protected and should not be disclosed, is subject to appropriate sanctions.