[No. D041788. Fourth Dist., Div. One. Dec. 3, 2003.]

DAVID SNIDER, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
QUANTUM PRODUCTIONS, INC., Real Party in Interest.

**COUNSEL**

Clinton M. Sandvick for Petitioner.

No appearance for Respondent.

Law Offices of James E. Lund, James E. Lund and Nathan Low for Real Party in Interest.

**OPINION**

**NARES, J.**—In this petition for writ of mandate (petition) we are presented with the question whether the trial court properly disqualified Attorney Dale Larabee from representing petitioner David Snider because of his contacts with two employees, one a sales manager and the other a director of production, of respondent Quantum Productions, Inc. The court found that

Larabee violated California's State Bar Rules of Professional Conduct, rule 2-100,[1] which provides in part:

"(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a *party* the member *knows to be represented by another lawyer in the matter*, unless the member has the consent of the other lawyer.

"(B) For purposes of this rule, a '*party*' includes:

"(1) *An officer, director, or managing agent of a corporation* or association, and a partner or managing agent of a partnership; or

"(2) An association member or *an employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.*" (Italics added.)

We conclude that there was no violation of rule 2-100 as the contacted employees were not "represented parties" within the scope of that rule as (1) they were not "officer[s], director[s] or managing agent[s]" of the organization;[2] (2) the subject matter of the communications was not an act or omission of the employees that could be binding or imputed to the organization; and (3) they were not employees whose statements might constitute admissions on behalf of the organization. We further conclude that if the employees were subject to rule 2-100, the court still erred in ordering the disqualification of Larabee as the evidence did not show that he had actual knowledge the employees were represented parties. Accordingly, we grant Snider's petition and order the superior court to vacate its order disqualifying Larabee and his firm from representing Snider in this action.

We emphasize, however, that counsel desiring to contact an employee of a represented organization should endeavor to ensure, prior to the contact, that the employee, either because of his or her status within the organization or the subject matter of the proposed communication, does not come within the scope of rule 2-100. Further, once contact is made, counsel should at the outset pose questions designed to elicit information that would determine whether the employee comes within rule 2-100's scope and should not ask

---

[1] All further rule references are to the California State Bar Rules of Professional Conduct unless otherwise specified.

[2] We use the term "organization" in this opinion to refer to an association, corporation or partnership, as those terms are used in rule 2-100.

questions that could violate the attorney-client privilege. By the same token, if organizations do not want employees within the scope of rule 2-100 to have contact with opposing counsel, it is incumbent upon them to take proactive measures to ensure that the employees and opposing counsel understand the organization's position. Ethical violations and unnecessary litigation over such ex parte contacts would largely be obviated by prudent actions taken by counsel and organizations in applying rule 2-100.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual Background*

Snider was employed by Quantum, an event design and construction company, as a sales manager. In 2002 Snider resigned and formed Gardenia Design Group (Gardenia), which Quantum alleged was in direct competition with Quantum. Quantum also alleged that Snider misappropriated confidential and secret business information from Quantum and used that information to compete with Quantum. In July 2002 Quantum filed a complaint against Snider and Gardenia, alleging misappropriation of trade secrets, breach of contract, intentional interference with contractual relations and prospective economic advantage, and unfair competition.[3] Snider denies Quantum's allegations.

### B. *Procedural Background*

### 1. *The Motion to Disqualify*

In the joint trial readiness report filed with the court prior to trial, Quantum listed as a percipient witness, among others, its employee Toni Lewis. Snider and Gardenia listed as percipient witnesses, among others, Lewis and Laura Janikas, also a Quantum employee.

Thereafter, between the joint trial readiness conference and trial, Larabee contacted Lewis and Janikas to talk with them about the pending case. When counsel for Quantum discovered the contacts, he brought a motion for a trial continuance and to disqualify Larabee from representing Snider (motion to disqualify).

In support of the motion to disqualify, Quantum submitted the declaration of its president, Pam Navarre, as well as declarations from Janikas and Lewis. In Navarre's declaration she stated that Quantum employs approximately 40

---

[3] Gardenia is not a party to this appeal as it is apparently only a fictitious name under which Snider does business.

people. She stated that she and Quantum's vice-president, Bill Hardt, were the only executive-level personnel at the company. She further stated that below the executives in the company were two sales managers, a director of operations, and a director of production. Janikas was a sales manager, and her duties included selling Quantum's goods and services and supervising two subordinate employees. She was also responsible for enforcing Quantum's rules, policies and procedures. Janikas had the authority to direct all work by others in the company in relation to the goods and services she contracted to provide on behalf of Quantum. According to Navarre, the position of sales manager was a position of great confidence in the company and she relied on the counsel and input of Janikas in making corporate policies and decisions. Navarre did not describe Lewis's position at Quantum.

In her declaration, Janikas described her work for Quantum as including "management responsibilities." She stated that she had been aware of the litigation for months but had not discussed it at length with her superiors. She stated that in January 2003 Larabee called her at home on two occasions and left messages for her. She returned one of his calls and left a message for Larabee. Larabee was able to reach her on her work cellular phone. According to Janikas, she talked to Larabee for about 10 minutes.

Janikas stated that Larabee "asked [her] many questions about this lawsuit, and made [her] feel like [she] was on the witness stand." He asked her if she knew the "real reason" why Quantum had sued Snider. She replied that she understood that he had been sued because he breached his contract with Quantum. Larabee asked if she had seen Snider's contract with Quantum. She replied that she had not. Larabee asked her if she had signed a contract. She replied that she had, as had all other employees. Larabee asked her what she thought the contract meant, and Janikas attempted to explain it to him. Larabee asked Janikas if Quantum sold wedding services before Snider quit. She responded that it did. Larabee also asked her about a meeting of key employees in October 2001. Larabee also asked her if she took a pay cut after September 11, 2001, and whether that made her want to leave Quantum. He asked her "many more questions" that she could not remember. At the end of the conversation Larabee asked her if Quantum's counsel had ever called and talked to her. She responded that he had not.

In her declaration, Lewis stated that she was the director of productions for Quantum, and described her work there, which included supervising the production department and its 19 employees. Larabee first called her before Christmas 2002. He left a message on her work cellular phone number saying that he wanted to meet her. Larabee left several additional messages for her and she eventually returned his calls in January 2003. She agreed to meet with him at his offices, but she did not make the appointment. According to Lewis, Larabee never asked her if counsel represented her.

Larabee filed a declaration in opposition to Quantum's motion. In that declaration he stated that he had no intention of calling Janikas or Lewis as witnesses in the case. He also confirmed that he never spoke with Lewis concerning the case; his only conversations with her were unsuccessful attempts to set up a meeting. He stated that he had asked both Janikas and Lewis if counsel for Quantum had talked to them about trial testimony and they both stated that they had not. Before contacting them, he asked Snider what duties and responsibilities they had. Snider told Larabee that they were salespeople with no corporate responsibility. Based upon this he concluded that they were not within the "control group" of Quantum's management and he did not believe that they could bind or make an admission on behalf of the organization. Larabee only wanted to ask them about matters of which they had percipient knowledge, particularly about a meeting in the fall of 2001 when Navarre told the employees that business was bad and that if they wanted to look for another job they could do so. Larabee admitted asking Janikas if she had any idea why Snider had been sued. According to Larabee, she stated that she did not.

Larabee also stated that he told Janikas and Lewis that he was Snider's counsel and they did not have to talk to him if they did not want to. He stated that Lewis had called him back as many times as he called her and that she wanted to talk to Larabee. According to Larabee, Lewis also contacted Snider on her own and told Snider that she had to rewrite her declaration multiple times because Quantum's attorneys did not like it and that they "told her what to say."

Larabee also stated that he did not believe that there was an attorney-client relationship between Quantum's attorney and Lewis and Janikas. He stated that he waited until after the trial readiness conference to contact them as he wanted to give counsel a chance to tell the employees not to talk to him.

Larabee submitted an expert declaration from Dennis Schoville, an attorney, in which he opined that Larabee did not violate rule 2-100. However, the court did not consider that document because it was filed late.

### 2. The Court's Ruling

In February 2003 the court granted Quantum's motion to disqualify Larabee as Snider's counsel. In doing so, the court made the following findings in its tentative ruling: "This Court concludes that the attorney client privilege has been compromised by [Larabee's] contacts and interviews with Plaintiff's Sales Manager, Laura Janikas, and Director of Production, Toni Lewis, and that Rule 2-100 of the Rules of Professional Conduct appears to have been violated by such conduct. The appropriate sanction is that [Larabee] be relieved as counsel for Defendant [Snider] and [Gardenia]."

At the hearing on the motion, Larabee requested that live testimony be heard from the witnesses before the court disqualified him. The court denied the request and confirmed the tentative ruling. In doing so the court found that (1) Janikas and Lewis were management-level employees that were part of Quantum's "control group"; and (2) they were employees whose statements could be deemed admissions on the part of the organization.

The court also indicated that it probably would not be appropriate for Larabee's partner, Joshua Gruenberg, to substitute in as new counsel for Snider. When Snider thereafter attempted to substitute Gruenberg in as his new counsel, the court cancelled the file stamp on the substitution form and returned the form to counsel. In the "sendback" notice the court indicated that it had ordered the disqualification of not only Larabee, but his firm as well.

## DISCUSSION

On this petition Snider asserts that the court erred in ordering disqualification as (1) Larabee did not know the employees were represented by counsel; (2) the employees he contacted did not come within the terms of rule 2-100; (3) the court should not have disqualified another member of his firm; and (4) Quantum was not prejudiced by the contacts. We grant Snider's petition.

### I. *Standard of Review*

We review the court's decision to disqualify Snider's counsel under the abuse of discretion standard. (*Nalian Truck Lines, Inc. v. Nakano Warehouse & Transportation Corp.* (1992) 6 Cal.App.4th 1256, 1261 [8 Cal.Rptr.2d 467] (*Nalian*).) This discretion is " 'subject to the limitations of the legal principles governing the subject of its action, and subject to reversal on appeal where no reasonable basis for the action is shown. [Citation.]' [Citation.]" (*Ibid.*)

### II. *Were Janikas and Lewis Employees Subject to Rule 2-100?*

#### A. *Policies Concerning Rule Against Ex Parte Contact*

"Contact with represented parties is proscribed to preserve the attorney-client relationship from an opposing attorney's intrusion and interference." (*Jackson v. Ingersoll-Rand Co.* (1996) 42 Cal.App.4th 1163, 1167 [50 Cal.Rptr.2d 66].) "Moreover, with regard to the ethical boundaries of an attorney's conduct, a bright line test is essential. As a practical matter, an attorney must be able to determine beforehand whether particular conduct is permissible; otherwise, an attorney would be uncertain whether the rules had been violated until . . . he or she is disqualified. Unclear rules risk blunting an

advocate's zealous representation of a client." (*Nalian, supra,* 6 Cal.App.4th at p. 1264.) Further, rule 2-100 must be interpreted narrowly because "a rule whose violation could result in disqualification and possible disciplinary action should be narrowly construed when it impinges upon a lawyer's duty of zealous representation." (*Continental Ins. Co. v. Superior Court* (1995) 32 Cal.App.4th 94, 119 [37 Cal.Rptr.2d 843] (*Continental*).)

## B. *Covered Employees*

To determine whether Larabee violated rule 2-100 by contacting Janikas and Lewis, we must first determine whether they were "covered employees," i.e., those with whom contact was proscribed under rule 2-100. In order to decide this issue we must look to the development of the rule preventing ex parte contact with employees of represented entities, reviewing California authority, American Bar Association (ABA) Model Rule 4.2, and out-of-state authority.

### 1. *California Authority*

Former rule 7-103 provided: "A member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel. This rule shall not apply to communications with a public officer, board, committee or body."

In 1977 a committee of the Los Angeles County Bar Association interpreted former rule 7-103 in a formal opinion. In that opinion, the committee stated that there was "nothing unethical in an attorney interviewing a nonmanagement employee of an adverse party who may be a witness without the consent of that party's attorney . . . ." (Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 369 (Nov. 23, 1977) p. 69.)[4] The committee found the test to be "the extent to which the employees are 'closely identified with management of the company.' " (*Ibid.*) Thus, at that time, former rule 7-103 was interpreted to allow ex parte contact with a represented organization's employees unless they were members of the organization's "control group." (*Continental, supra,* 32 Cal.App.4th at p. 114.) An organization's control group has been stated as consisting of " ' "officers and agents . . . responsible for directing [the company's] actions in response to legal advice." ' " (*Bobele v. Superior Court* (1988) 199 Cal.App.3d 708, 712 [245 Cal.Rptr. 144].)

---

[4] "Although not binding, opinions of ethics committees in California should be consulted by members for guidance on proper professional conduct. Ethics opinions and rules and standards promulgated by other jurisdictions and bar associations may also be considered." (Rule 1-100(A).)

However, in 1981 the United States Supreme Court issued its decision in *Upjohn Co. v. United States* (1981) 449 U.S. 383, 390 [66 L.Ed.2d 584, 101 S.Ct. 677] (*Upjohn*), wherein the high court held that "the corporate attorney-client privilege extends not only to communications between corporate counsel and members of the control group, but also to communications with middle and low level corporate employees." (*Continental, supra,* 32 Cal.App.4th at p. 114.) In response to *Upjohn*, the Los Angeles County Bar Association and the San Diego County Bar Association issued new opinions concerning the propriety of ex parte contacts with employees of organizations represented by counsel. (Cal. Compendium on Prof. Responsibility, L.A. County Bar Assn. Formal Opn. No. 410 (Mar. 24, 1983) p. 114 (Formal Opinion No. 410); Cal. Compendium on Prof. Responsibility, San Diego County Bar Assn. Ethics Opn. No. 1984-5, p. 1 (Ethics Opinion No. 1984-5).) In Formal Opinion No. 410, a Los Angeles County Bar Association committee concluded, based upon the *Upjohn* decision, that it was "best to draw a clear and unequivocal line—opposing counsel should not have ex parte contact concerning a subject of controversy with the employees of a corporate party to the controversy." (Formal Opn. No. 410, *supra,* at p. 115.) In Ethics Opinion No. 1984-5, a San Diego County Bar Association committee also adopted a strict prohibition against ex parte contact with employees of a represented organization: "It would not be proper for an attorney to contact an employee of an organization regarding matters within the scope of the employee's employment without first obtaining the consent of the organization's counsel." (Ethics Opn. No. 1984-5, *supra,* at p. 1.)

Relying on Formal Opinion No. 410 and the *Upjohn* case, the court in *Mills Land & Water Co. v. Golden West Refining Co.* (1986) 186 Cal.App.3d 116 [230 Cal.Rptr. 461] (*Mills*) upheld the disqualification of an attorney under former rule 7-103 for making ex parte contact with the opposing organization's former president, who had remained on its board of directors. In doing so, the Court of Appeal rejected the "control group" test to determine the propriety of ex parte contacts with employees of represented organizations. (*Mills, supra,* 186 Cal.App.3d at p. 130.) As the court in *Mills* stated: "The question is not simply whether [the former president] was in a position to bind [the organization] in some fashion. His position makes him potentially privy to privileged information about the litigation." (*Id.* at p. 128, italics & fn. omitted.) Thus, the court in *Mills* adopted the "blanket" rule regarding ex parte contacts stated in Formal Opinion No. 410 and Ethics Opinion No. 1984-5, prohibiting ex parte contact with any current employees of an organization. (*Mills,* at p. 130.; see also *Bobele v. Superior Court, supra,* 199 Cal.App.3d at p. 714 ["Plaintiffs may not contact ex parte any current employees" of defendant organization].)

Two years later, in 1988, rule 7-103 was repealed and the current rule 2-100 was adopted, providing in part:

"(A) While representing a client, a member shall not communicate directly or indirectly about the subject of the representation with a *party* the member *knows to be represented by another lawyer in the matter*, unless the member has the consent of the other lawyer.

"(B) For purposes of this rule, a *'party'* includes:

"(1) *An officer, director, or managing agent of a corporation* or association, and a partner or managing agent of a partnership; or

"(2) An association member or *employee of an association, corporation, or partnership, if the subject of the communication is any act or omission of such person in connection with the matter which may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.*" (Italics added.)

The drafters of rule 2-100 stated that the new paragraph (B) was "intended to clarify the troubling issue of which employees of an entity may be approached without consent of the attorney for the entity when the entity is the opponent." (State Bar of Cal., Off. of Prof. Stds., Request That Supreme Court Approve Amendments to the Rules of Professional Conduct (Dec. 1987) p. 24.) The original draft of proposed rule 2-100 provided for a blanket rule against ex parte contact with any current employees of a represented organization, stating: "While representing a client, a member shall not communicate directly or indirectly about the subject matter of the representation with a party the member knows to be represented by another lawyer in the matter, *or with an employee of such party*, unless the member has the consent of the other lawyer." (Discussion Draft: Proposed Amends. to Rules of Prof. Conduct (Aug. 1986) p. 37, italics added).

However, based upon numerous comments objecting to the inclusion of all employees within the scope of rule 2-100, the foregoing italicized phrase was eliminated. Instead, the drafters proposed using the "control group" test. The drafters discussed the control group test and the impact of the *Upjohn* decision: "The issue has sometimes been analogized to the issue of whether commun[i]cations between a party's counsel and that party's employees are protected by the attorney work product rule and the attorney-client privilege. Some courts have applied the so-called 'control group test' in this situation. The test restricts the availability of the privilege to a control group—those employees who play a substantial role in deciding and directing the employee's legal response. In [*Upjohn, supra*, 449 U.S. 391], the Supreme Court rejected that test, noting that it frustrates the very purpose of the attorney-client privilege by discouraging the communication of relevant information

by employees of the client to attorneys seeking to render legal advice to the client corporation, that such advice will frequently be more significant to noncontrol group members than those who officially sanction the advice, and that the test makes it more difficult to convey full and frank legal advice to the employees who will put into effect the client corporation's policy." (State Bar of Cal., Off. of Prof. Stds., Request That Supreme Court Approve Amendments to the Rules of Professional Conduct, *supra,* at pp. 24–25.) The drafters also discussed Formal Opinion No. 410 and Ethics Opinion No. 1984-5, and their conclusions that it was improper to contact ex parte any employee of a represented party if the information sought related to the subject of the controversy. (State Bar of Cal., Office of Prof. Stds, *supra,* at pp. 24–25.) Nonetheless, the drafters of rule 2-100 proposed adopting the control group test for ex parte communications with employees of represented organizations: "[T]he large number of comments received on [proposed rule 2-100], which proposed prohibiting members from communicating with the employee of a corporate opponent, stressed the hardship that such a prohibition would create on certain litigants. The employment discrimination bar, both public and private, pointed out that such a prohibition would make it virtually impossible to investigate claims prior to filing a suit, thus requiring more lawsuits to be filed and costly depositions taken. In addition, certain administrative proceedings have no mechanisms for formal discovery at all, thus making it possible that some potential witnesses would never be interviewed at all. *As a result of these comments and others, it is proposed that paragraph (B) utilize the 'control group test.' "* (State Bar of Cal., Off. of Prof. Stds., *supra,* at p. 26, italics added.) According to one later opinion, the drafters of rule 2-100, "cognizant of *Upjohn's* holding, nonetheless decided to retain the control group test." (*Nalian, supra,* 6 Cal.App.4th at p. 1262, fn. 7.)

At the time the California Supreme Court was requested to approve the amendments to the Rules of Professional Conduct, rule 2-100(B)(2) read: "An association member or an employee of an association, corporation, or partnership, if the subject matter of the communication is any act or omission of such person which may be binding on such entity or which may be a basis of a claim or defense involving that entity." (State Bar of Cal., Off. of Prof. Stds., *supra,* enclosure 1, p. 5.) However, the high court expressed concerns concerning the clarity of this language, suggesting the "definition would be clearer if it rested instead on the potential legal 'liability' of the employee and/or corporation," citing the decision in *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723 [36 Cal.Rptr. 468, 388 P.2d 700] (*D. I. Chadbourne*) and the comment to ABA Model Rule 4.2. (Laurence P. Gill, Clerk of Cal. Supreme Court, letter to Terry Anderlini, President of the State Bar of Cal. re Bar Misc. 5626, June 9, 1988.) In *D. I. Chadbourne, supra,* 60 Cal.2d 723, the California Supreme Court decided the issue of which

communications by an organizational employee, who was not also a codefendant or one who could be charged with liability, could be deemed privileged. The high court created the following test: "[H]is communication should not be so privileged unless, under all of the circumstances of the case, he is the natural person to be speaking for the corporation; that is to say, that the privilege will not attach in such case unless the communication constitutes information which emanates from the corporation (as distinct from the nonlitigant employee), and the communicating employee is such a person who would ordinarily be utilized for communication to the corporation's attorney." (*Id.* at pp. 736–737.) The Comment to ABA Model Rule 4.2 will be discussed, *post.*

Thereafter, the drafters responded to the Supreme Court's concerns by revising paragraph (B)(2) of rule 2-100 to its current form. (State Bar of Cal., Off. of Prof. Stds., Supplemental Mem. (Sept. 1988) p. 9.) In their written response, the drafters stated, "As to the Court's comment regarding the 'binding' standard in rule 2-100(B)(2) being ambiguous, the language of the proposed rule was not intended to be substantively different from the 'liability" test in the Comment to ABA Model Rule 4.2. Indeed, the 'liability' test appears to be a clearer formulation of the concept underlying [rule] 2-100(B)(2). In order to clarify the rule, it is recommended that the 'liability' test from ABA Model Rule 4.2 be added to [rule] 2-100(B)(2) . . . ." (*Ibid.*) The California Supreme Court thereafter approved rule 2-100.

The parameters of rule 2-100(B) are stated succinctly in *Triple A Machine Shop, Inc. v. State of California* (1989) 213 Cal.App.3d 131, 140 [261 Cal.Rptr. 493] (*Triple A*): "[R]ule 2-100 permits opposing counsel to initiate ex parte contacts with . . . present employees (other than officers, directors or managing agents) who are not separately represented, so long as the communication does not involve the employee's act or failure to act in connection with the matter which may bind the corporation, be imputed to it, or constitute an admission of the corporation for purposes of establishing liability." In that case, the Court of Appeal, while not discussing in detail the reach of the new rule 2-100, rejected the previous blanket prohibition and held that the government attorney's ex parte contact with the defendant's assistant facilities manager was not improper. (*Triple A Machine Shop, Inc. v. State of California, supra,* at pp. 140–143.)

■ Although the drafters of rule 2-100 and the court in *Nalian* characterize rule 2-100 as prohibiting contact only with members of an organization's "control group," the actual text of paragraph (B)(2) suggests that rule may be a bit broader than that. It is true that paragraph (B)(1) states the control group test: officers, directors and managing agents of the organization may not be contacted for any purpose. However, paragraph (B)(2) focuses on the subject

matter of the communication and arguably applies to employees outside of an organization's control group if the subject matter of the conversation is the employee's act or failure to act in connection with the matter at issue, *and* that act or failure to act could bind the organization, be imputed to it, *or* if the employee's statement could constitute an admission against the organization.

With regard to statements that could constitute admissions on the part of the organization, Evidence Code section 1222 provides in part: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement." This has been interpreted in California as only applying to high-ranking organizational agents who have actual authority to speak on behalf of the organization. (See *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 572 [69 Cal.Rptr.2d 389] [statement on behalf of organization admissible because author held a "particularly high place in the employer's hierarchy" and evidence showed authorization to speak on its behalf].)

### 2. *Model Rule 4.2*

ABA Model Rules of Professional Conduct, rule 4.2 (ABA Model Rule 4.2), provides for a proscription against certain ex parte contacts with employees of represented organizations, similar to California's former rule 7-103: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."

Although ABA Model Rule 4.2 is stated in general terms, the comment to that rule provides further guidance as to its scope and application to employees. At the time rule 2-100 was adopted, the comment to ABA Model Rule 4.2 read substantially the same as California rule 2-100(B)(1) and (2), providing in part that: "[i]n the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."

However, the comments to ABA Model Rule 4.2 were substantially revised when the ABA Model Rules were revised in 2002.[5] As amended, the relevant portion of the comment reads: "In the case of a represented organization, this Rule prohibits communications with a constituent of the organization who supervises, directs or regularly consults with the organization's lawyer concerning the matter or has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for the purposes of civil or criminal liability."

The revisions to the comment were meant "to 'clarif[y] application of the Rule to organizational clients.' " (*Palmer v. Pioneer Inn Associates, Ltd.* (2002) 118 Nev. 95 [59 P.3d 1237, 1242] (*Palmer*).) The phrase "whose statement may constitute an admission on the part of the organization" was omitted from the comment "because it had been misapplied to situations when an employee's statement could be admissible against the organizational employer, when the clause was only ever intended to encompass those few jurisdictions with a law of evidence providing that statements by certain employees of an organization were not only admissible against the organization but could not thereafter be controverted by the organization." (*Ibid.*, fn. omitted.)

### 3. *Out-of-State Authority*

In interpreting ABA Model Rule 4.2 and their own rules governing attorney ethics, state and federal courts have come up with various tests to determine which employees of represented organizations may be contacted by opposing counsel. (*Palmer, supra,* 59 P.3d at p. 1242.) On one end is the "blanket" test, which prohibits contact with any current or former employees of an organization. (*Ibid.*) At the other end is the " 'control group' test, which covers only high-level management employees. Several tests fall in the middle, including a party-opponent admission test, a case-by-case balancing test, and a 'managing-speaking agent' test." (*Ibid.*) Given the comments of the drafters of California rule 2-100 and its text, California did not intend to adopt a blanket prohibition on communications with an organization's employees. However, cases adopting the restrictive "control group" test, and those adopting a more middle-ground approach, provide authority helpful to our analysis of whether Janikas and Lewis were employees covered by the terms of rule 2-100.

One case has defined the "control group" that is subject to the proscription against ex parte contact as the "litigation control group," which consists of

---

[5] The only revision to the text of ABA Model Rule 4.2 in 2002 was the addition of the language "or a court order" at the end of the rule.

" 'agents and employees responsible for, or significantly involved in, the determination of the organization's legal position in the matter . . . .' " (*Michaels v. Woodland* (1997) 988 F.Supp. 468, 471.) The court in that case also noted that fact witnesses are not a part of the control group. (*Ibid.*) Another case has defined the control group as being " 'limited to those managerial employees with authority to commit the organization to a position regarding the subject matter of representation.' " (*Johnson v. Cadillac Plastic Group, Inc.* (1996) 930 F.Supp. 1437, 1442.) "Examples of the types of employees capable of committing an organization are those 'whose duties include making litigation decisions' or 'answering the type of inquiries posed.' [Citation.]" (*Ibid.*) These definitions of "control group" are consistent with California's, those " ' "high level employees responsible for directing [the company's] actions in response to legal advice." ' " (*Bobele, supra,* 199 Cal.App.3d at p. 712.)

Courts adopting the control group test conclude that it "serves the policies of preserving the availability of witnesses, reducing discovery costs by permitting informal interviews of a broad range of employees, and affording the best opportunity for pre-litigation fact investigation. The test has become disfavored following the *Upjohn* decision, because the control group test is narrower than the attorney-client privilege rule approved in that case. Also, it lacks predictability because it is not always clear which employees fall within the 'control group.' " (*Palmer, supra,* 59 P.3d at p. 1245, fns. omitted.)

Cases that have taken a more middle-ground approach attempt to reconcile the competing interests of attorneys seeking discovery and the legitimate concerns of an organization to protect privileged matter. Closest to the blanket rule is the "party-opponent admission" test. Under this test, contact is proscribed with "any employee whose statement might be admissible as a party-opponent admission." (*Palmer, supra,* 59 P.3d at p. 1243.) Courts adopting the party-opponent admission test relied upon the language of the former comment to ABA Model Rule 4.2 and concluded "that the former comment's reference to 'admissions' was clearly meant to incorporate the rules of evidence governing admissions." (*Palmer, supra,* 59 P.3d at p. 1243.) Supporters of this test reason that it gives " 'a sound practical cast to the rule: those who can hurt or bind the organization *with respect to the matter at hand* are off limits except for formal discovery or except with the consent of the entity's lawyer.' " (*Brown v. St. Joseph County* (N.D.Ind. 1993) 148 F.R.D. 246, 254.) In jurisdictions that would interpret the evidentiary rule broadly, "it essentially covers all or almost all employees, since any employee could make statements concerning a matter within the scope of his or her employment, and thus could potentially be included within the rule." (*Palmer, supra,* 59 P.3d at p. 1243, fn. omitted.)

However, this interpretation of the former comment's reference to employees whose statements can be considered evidentiary "admissions" is of doubtful validity today given the deletion of that portion of the comment to ABA Model Rule 4.2 and the explanation given for that deletion. Moreover, in jurisdictions that follow the traditional common law rule, such as California, an employee's admission would be "imputed to the employer only if the employee *had authority to speak on the employer's behalf.*" (Comment, *Ethical Limitations on Investigating Employment Discrimination Claims: The Prohibition on Ex Parte Contact with a Defendant's Employees* (1991) 24 U.C. Davis L.Rev. 1243, 1274–1275 & fn. 159, italics added; Evid. Code, § 1222.) "These jurisdictions interpret the common law rule restrictively, typically imputing to the employer only the statements of high-ranking executives and spokespersons." (Comment, *supra,* 24 U.C. Davis L.Rev. at pp. 1275–1276.) As discussed, *ante,* California follows this restrictive interpretation of what employee statements constitute admissions on the part of their organizational employer.

The "managing-speaking agent" test evolved in response to the *Upjohn* decision. Jurisdictions following this test "reasoned that the protection afforded an organization under the no-contact rule should be commensurate with that afforded by the attorney-client privilege." (*Palmer, supra,* 59 P.3d at p. 1244; *Wright by Wright v. Group Health Hosp.* (1984) 103 Wn.2d 192 [691 P.2d 564] (*Wright*).) *Wright,* the leading case adopting this test, held that the managing-speaking agent test restricts the no-contact rule to those employees having "managing authority sufficient to give them the right to speak for, and bind, the corporation." (*Wright, supra,* 691 P.2d at p. 569.) This test would not bar contact with managers whose responsibilities are unrelated to the representation at issue. (*Id.* at p. 570; Comment, *supra,* 24 U.C. Davis L.Rev. at p. 1288, fn. 224.) "Courts adopting this test have concluded that it best balances the competing policies of protecting the organizational client from overreaching by opposing counsel through direct contact with its employees and agents, and the adverse attorney's need for information in the organization's exclusive possession that may be too expensive or impractical to obtain through formal discovery." (*Palmer, supra,* 59 P.3d at p. 1245; *Wright, supra,* 691 P.2d at p. 569.) Followers of this rule also note that the purpose of the rule "is not to protect an organization from the revelation of prejudicial facts, thus disapproving of the party-opponent admission test." (*Palmer, supra,* at p. 1245.) This test has been adopted by several jurisdictions. (Comment, *supra,* 24 U.C. Davis L.Rev. at p. 1288, fn. 222.)

Some courts have adopted a "case-by-case balancing" test. (*Palmer, supra,* 59 P.3d at pp. 1245–1246.) "Under this test, the particular facts of the case must be examined to determine what informal contacts may be appropriate in light of the parties' specific needs. Factors to be considered are the claims asserted, the employee's position and duties, the employer's interests in

protecting itself, and the alternatives available to the party seeking an informal interview." *(Ibid.*; *Baisley v. Missisquoi Cemetery Ass'n* (1998) 167 Vt. 473 [708 A.2d 924].) However, this test offers little guidance in advance as to whether it is proper to conduct an ex parte interview and has only been applied when an attorney seeks guidance from a court in advance of the contact. *(Palmer, supra,* 59 P.3d at p. 1246.)

Finally, there is what has been called the "alter ego" or "New York" test. *(Palmer, supra,* 59 P.3d at p. 1246.) Under this test, a New York court held the no-contact rule applied to "corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos') or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel." *(Niesig v. Team I* (1990) 76 N.Y.2d 363 [558 N.E.2d 1030, 1035, 559 N.Y.S.2d 493].) This test "would clearly permit direct access to employees who were merely witnesses to an event for which the corporate employer is sued." *(Id.* at pp. 1035–1036.)

### C. *Analysis of Janikas's and Lewis's Status at Quantum*

#### 1. *Paragraph (B)(1)*

To determine whether Lewis and Janikas were within the ambit of rule 2-100, we must first determine whether they were officers, directors or "managing agents" of Quantum. The parties agree that neither were officers or directors. The dispute lies in whether they were managing agents of Quantum.

Quantum concedes that paragraph (B)(1) refers to Quantum's "control group," i.e., "officers and agents . . . responsible for directing [the company's] actions in response to legal advice." *(Upjohn, supra,* 449 U.S. at p. 391; *Nalian, supra,* 6 Cal.App.4th at p. 1259, fn. 1, quoting & citing *Upjohn.)* Quantum nevertheless goes on to argue that a broad interpretation must be given to the term "managing agent," one that would include Lewis and Janikas even if they were mid- or lower-level employees, in order to protect the attorney-client privilege. This argument is unavailing.

In support of its proposition that the term "managing agent" refers to mid- or low-level employees, Quantum relies on authority that predates rule 2-100, including *Mills, Upjohn,* and Formal Opinion No. 410, and ignores the fact that the drafters of rule 2-100 expressly rejected such a broad no-contact

rule.[6] Rather, we must look to the meaning of the term "managing agent" and the intent of the drafters of rule 2-100 to determine whether it applied to Janikas and Lewis.

Snider contends that the definition of "managing agent" in rule 2-100 is the same as that in Civil Code section 3294, subdivision (b), which requires wrongdoing by an "officer, director, or managing agent" before punitive damages will be awarded against an organization for an employee's act.[7] In *White v. Ultramar* (1999) 21 Cal.4th 563, 573 [88 Cal.Rptr.2d 19, 981 P.2d 944] (*White*), a wrongful termination action, the California Supreme Court defined "managing agent" for the purposes of organizational liability for punitive damages as including only an employee that "exercises substantial discretionary authority over decisions that ultimately determine corporate policy." The high court later restated the test in different terms, holding that a managing agent is an employee that "exercise[s] substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.) In reaching this conclusion, the high court stated that the Legislature placed the term "managing agent" "next to the terms 'officer' and 'director,' intending that a managing agent be more than a mere supervisory employee." (*Id.* at p. 573.) The court also rejected a broader definition of managing agent, stating that, "[i]f we equate mere supervisory status with managing agent status, we will create a rule where corporate employers are liable for punitive damages in most employment cases." (*Id.* at p. 575.)

We conclude that the definition of managing agent in *White* applies equally well to rule 2-100(B)(1). First, like Civil Code section 3294, the term "managing agent" immediately follows the terms "officer" and "director," indicating an intention to limit the term to high-level management, not mere supervisory employees. This is so because in interpreting statutes (and rules) we seek to " 'ascertain common characteristics among things of the same kind, class, or nature when they are cataloged in legislative enactments.' [Citation.]" (*White, supra,* 21 Cal.4th at p. 573.)

Further, the history behind rule 2-100's adoption supports a narrow reading to the term. The drafters specifically stated that they intended that rule 2-100

[6] Additionally, *Upjohn* is not controlling as the issue presented there was the attorney-client privilege and here it is the scope of the no-contact rule. (*Palmer, supra,* 59 P.3d at p. 1244; *Wright, supra,* 691 P.2d at pp. 566–567, 571.)

[7] Civil Code section 3294, subdivision (b) provides: "An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an *officer, director, or managing agent* of the corporation." (Italics added.)

would adopt the "control group" test. While the language of paragraph (B)(2) may be broader than that test (as we discuss, *post*), paragraph (B)(1) adopts that test, given the terms employed. A "managing agent" that exercises substantial discretionary authority over organizational policy making is consistent with the definition of control group members, those " ' "officers and agents . . . responsible for directing [the company's] actions in response to legal advice." ' " (*Bobele, supra,* 199 Cal.App.3d at p. 712.)

Quantum asserts that it would be improper to use the definition of managing agent adopted in the *White* case because that case sought to limit the award of punitive damages against organizations, whereas rule 2-100 is designed to protect the attorney-client privilege, which requires a broader definition. We reject this contention. First, it ignores the *White* court's discussion of the grouping of the words "officer, director or managing agent." Rule 2-100 and Civil Code section 3294 use the exact same grouping. Further, to support this proposition Quantum again relies upon *Mills* and *Upjohn*, authority that the drafters of rule 2-100 rejected in adopting the final language for paragraph (B)(1). In fact, the drafters of rule 2-100 expressly intended that the number of "covered employees" be limited in scope. Thus, the policy reasons behind the definition of "managing agent" enunciated in *White* are consistent with the policies behind rule 2-100. In sum, we conclude that the term "managing agent" in rule 2-100 refers to those employees that exercise substantial discretionary authority over decisions that determine organizational policy.

■ Applying this definition to Janikas and Lewis, there is no evidence in the record demonstrating that they fit within the definition of managing agents. Quantum's president Navarre described Janikas as a supervisory employee who could enforce Quantum's policies, and stated that she relied upon Janikas when she (Navarre) was setting corporate policy. However, Navarre did *not* state that Janikas had the discretion and authority to set corporate policy as to any issues, much less the matter involved in this litigation. Indeed, she stated that she and the company's vice-president were the only executive-level persons at Quantum. Navarre stated nothing in her declaration concerning Lewis's status at Quantum. Therefore, Janikas and Lewis did not fall within the terms of paragraph (B)(1) of rule 2-100.

2. *Paragraph (B)(2)*

Quantum argues that Janikas and Lewis were improperly contacted because they fell within the terms of paragraph (B)(2) of rule 2-100, as each was an employee whose "act or omission . . . in connection with the matter . . . may be binding upon or imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization." This argument is unavailing.

Preliminarily, this argument fails because there is no evidence that the subject matter of the contacts with the employees was concerning "any act or omission of such person in connection with the matter." The interview with Janikas did not concern her own actions or omissions concerning the dispute, but her percipient knowledge and understanding of events surrounding the dispute. In fact, Quantum does not, and the trial court did not, address this issue.

■ Quantum focuses on the second category in paragraph (B)(2) of rule 2-100, those employees whose statements "may constitute an admission on the part of the organization." However, as discussed, *ante*, this category only applies to "high-ranking executives and spokespersons" with the authority to speak on behalf of the organization. (Comment, *supra*, 24 U.C. Davis L.Rev. at pp. 1275–1276; *O'Mary v. Mitsubishi Electronics America, Inc., supra,* 59 Cal.App.4th at p. 572; Evid. Code, § 1222.) This interpretation is again consistent with the drafters of rule 2-100's rejection of the broader interpretation of the no-contact rule under former rule 7-103, and their desire to limit prohibited contact to only the organization's control group.

It is also consistent with the California Supreme Court and the drafters' intent to follow the comment to Model Rule 4.2 and the language of *D. I. Chadbourne, supra,* 60 Cal.2d 723, in their final revisions to this portion of rule 2-100(B)(2). The comment to Model Rule 4.2 was revised, omitting that portion discussing admissions by employees. In doing so, it was made clear that the original comment, upon which paragraph (B)(2) was based, was to be given a narrow interpretation, limited to "those few jurisdictions with a law of evidence providing that statements by certain employees of an organization were not only admissible against the organization but could not thereafter be controverted by the organization." (*Palmer, supra,* 59 P.3d 1 at p. 1242, fn. omitted.) *D. I. Chadbourne* used language that, applied to rule 2-100(B)(2), would limit its application to high-ranking management who speak for the organization.

■ It does appear that rule 2-100(B)(2) could apply to persons outside the "control group" if in fact the management-level employee was given actual authority to speak on behalf of the organization or could bind it with regard to the subject matter of the litigation. Despite the comments of the drafters of rule 2-100, this portion of the rule appears to follow the "managing-speaking agent" test: those employees "hav[ing] managing authority sufficient to give them the right to speak for, and bind, the corporation." (*Wright, supra,* 691 P.2d at p. 569.) This interpretation best reconciles the language of the statute and the drafters' intent to narrowly circumscribe the type of employees who would be covered by the rule.

The fact remains, however, that even under this test there was no evidence presented that Janikas or Lewis had authority from Quantum to speak concerning this dispute or any other matter, or that their actions could bind or be imputed to Quantum concerning the subject matter of this litigation. In sum, the evidence presented by Quantum does not demonstrate that Janikas and Lewis were employees subject to the terms of rule 2-100(B)(2).

### 3. *Protection for Employees Privy to Attorney-Client Information*

Quantum argues that Larabee violated rule 2-100 and disqualification was proper because he violated Quantum's attorney-client relationship and received "confidential" information concerning the litigation. Quantum also asserts that to protect the attorney-client relationship between employees and their employer's counsel, attorneys should be prohibited from contacting any employees of a represented organization. These arguments are unpersuasive.

In arguing for such a broad interpretation of rule 2-100 Quantum again relies upon cases and bar association opinions that predate the promulgation of rule 2-100. Quantum ignores the legislative history for rule 2-100 that expressly rejected the broad rule prohibiting any employee contact that *Upjohn* and the bar association opinions suggested. Instead, as we discussed above, the drafters opted for a combination of the "control group" and "managing-speaking agent" tests as the best balance between the competing policies of protecting confidential communications and allowing discovery of factual matters concerning the litigation.

Further, there was no evidence presented that Larabee actually violated the attorney-client privilege existing between Quantum and its counsel. There was no evidence presented that Quantum's counsel had any communications with Janikas or Lewis prior to Larabee's contacts and attempted contacts with them. Indeed, Janikas admitted both in her conversation with Larabee and in her declaration that she had never spoken with counsel for Quantum at the time of Larabee's contact. Lewis's declaration is silent on this issue.

Quantum argues that Larabee admitted "Lewis told him that corporate counsel coached her testimony." However, this misstates the record. Larabee stated in his declaration that Lewis, on her own, contacted *Snider* and told him that counsel for Quantum made her rewrite her declaration several times and "told her what to say." This does not establish violation of the attorney-client privilege by Larabee. It further is not a violation of rule 2-100 as the rule is not intended to prevent the parties themselves from communicating with respect to the subject matter of the representation. (Discussion Com. 23, pt. 3, West's Ann. Rules of Prof. Conduct (1996 ed.) foll. rule 2-100, p. 343.)

Quantum also points to Larabee's questioning of Janikas as to why Quantum sued Snider. We agree that this question was ill advised if Larabee did not know if the employee was privy to confidential communications with counsel. However, if Janikas had been privy to attorney-client protected information and it was disclosed to Larabee, Quantum would still have a remedy, regardless of whether Janikas came within the terms of rule 2-100. If an attorney violates the attorney-client privilege "the court may disqualify him or her from further participation in the case [citation] and, under certain circumstances, may exclude improperly obtained evidence or take other appropriate measures to achieve justice and ameliorate the effect of improper conduct." (*Triple A, supra,* 213 Cal.App.3d at p. 144.) However, Janikas has not asserted in her declaration that she was privy to such information or that she divulged it to Larabee.

Quantum points to Larabee's questions concerning a "key company meeting" Janikas attended. However, again there is no indication that counsel was present at that meeting and that confidential attorney-client information was discussed. Indeed, it appears that the meeting that was discussed occurred before Snider left Quantum, and Larabee's questions were only concerning factual matters of which Janikas was a percipient witness. There were no questions concerning anything Janikas did that could be binding on the organization. Moreover, as we have already concluded, Quantum did not establish that Janikas was an employee with authority to speak on behalf of the organization such that anything she told Larabee would constitute an admission on the part of the organization.

Quantum argues that because Janikas states in her declaration that Larabee asked her "many more questions I cannot remember right now," there might have been confidential information disclosed. However, this is mere speculation that cannot support a finding of a violation of rule 2-100, or disqualification of counsel.

With regard to Quantum's concerns that there could be a breach of the attorney-client privilege if attorneys were allowed to contact employees of a represented organization without advance permission, two points. First, organizations such as Quantum can instruct their employees to contact them before speaking to opposing counsel or they "can send the other party a letter warning that their employees are represented by counsel in the matter, and may not be interviewed under rule 2-100 without the consent of counsel." (*Jorgensen v. Taco Bell Corp.* (1996) 50 Cal.App.4th 1398, 1403 [58 Cal.Rptr.2d 178] (*Jorgensen*).)

Additionally, "it is clear that not all corporate employees are necessarily encompassed within the attorney-client privilege, just as rule 2-100 does not

bar contact with all corporate employees. For example, it is possible in any given case that a corporate officer or director covered by rule 2-100 may not be privy to information protected by the attorney-client .privilege, while a lower level employee who is not shielded from contact under rule 2-100 may be in possession of substantial privileged information. However, this does not enable corporate counsel to automatically assert the privilege as to every corporate employee and on that basis enjoin opposing counsel from any and all contact with employees not covered by rule 2-100." (*Triple A, supra,* 213 Cal.App.3d at p. 143.) If there were an actual breach of the attorney-client privilege through contacts made with employees who fall outside the scope of rule 2-100, an organization would still have remedies outside of rule 2-100 to remedy such a violation. (*Id.* at p. 144; see also *Peat, Marwick, Mitchell & Co. v. Superior Court* (1988) 200 Cal.App.3d 272, 291–292 [245 Cal.Rptr. 873].) Thus, organizations are still protected from disclosure of attorney-client privileged information even though opposing counsel may contact non-"control group" or non-"managing-speaking agent" employees of those organizations.

■ Nevertheless, to avoid potential violations of the attorney-client privilege, an attorney contacting an employee of a represented organization should question the employee at the beginning of the conversation, before discussing substantive matters, about the employee's status at that organization, whether the employee is represented by counsel, and whether the employee has spoken to the organization's counsel concerning the matter at issue. If a question arises concerning whether the employee would be covered by rule 2-100 or is in possession of privileged information, the communication should be terminated. ■ Once a dispute arises that could lead to litigation, it is also incumbent upon an organization and its counsel to take proactive measures to protect against disclosure of privileged information by informing employees and/or opposing counsel their position concerning communications between employees and opposing counsel. The exercise of caution and prudence on both sides will avoid much of the potential for violations of rule 2-100 or breach of attorney-client relationships.

### D. *Attorney Larabee's Knowledge*

Even if Quantum could demonstrate that Janikas or Lewis were subject to the terms of rule 2-100, we still would not conclude there was a violation of rule 2-100 as Quantum did not demonstrate that Larabee had actual knowledge that Janikas and Lewis were deemed "represented parties" under that rule.

The decisions in *Jorgensen, supra,* 50 Cal.App.4th 1398, and *Truitt v. Superior Court* (1997) 59 Cal.App.4th 1183 [69 Cal.Rptr.2d 558] (*Truitt*) are

instructive. In *Jorgensen,* the plaintiff was a former employee of the defendant who sued her employer, alleging she was sexually harassed and assaulted by her supervisor. Prior to filing suit, her attorney retained a private investigator that interviewed the alleged harasser and other employees of the defendant. (*Jorgensen, supra,* 50 Cal.App.4th at pp. 1399–1400.) The employer then brought a motion to disqualify the plaintiff's counsel, asserting that the attorney violated rule 2-100 because of the interviews. The plaintiff opposed the motion, asserting that at the time of the contacts counsel did not know that the defendant or its employees were a "party the member knows to be represented by another lawyer in the matter." (*Jorgensen, supra,* at p. 1400.) The trial court denied the motion to disqualify and the Court of Appeal affirmed that decision. (*Id.* at pp. 1400–1401.)

In affirming the trial court's order, the Court of Appeal stated that rule 2-100 "bars ex parte contact with current corporate employees who are specified in the rule as to any matter in which they are *known* to be represented by counsel." (*Jorgensen, supra,* 50 Cal.App.4th at p. 1401.) The court further stated that "[r]ule 2-100 should be given a reasonable, common-sense interpretation, and should not be given a 'broad or liberal interpretation' which would stretch the rule so as to cover situations which were not covered by the rule." (*Jorgensen, supra,* at p. 1401.) The court further rejected the employer's contention that rule 2-100 should apply not only when an attorney "knows" the other person is represented, but also where the attorney "should have known" that the other person was or would be represented. (*Jorgensen, supra,* at p. 1401.) The court also held that knowledge that the defendant organization employed in-house counsel "does not trigger the application of rule 2-100, unless the claimant's lawyer knows *in fact* that such house counsel represents the person being interviewed when that interview is conducted." (*Jorgensen, supra,* at p. 1402.) The court went on to hold that if organizations "wish to avoid having their employees interviewed in such situations, they have a number of options. They can instruct their employees not to speak to claimant's investigators. . . . [T]hey can send the other party a letter warning that their employees are represented by counsel in the matter, and may not be interviewed under rule 2-100 without the consent of counsel." (*Jorgensen, supra,* at p. 1403.)

In *Truitt,* an employee sued his employer, a railroad company, for injuries he suffered when he was struck by a front-end loader being operated by another employee. (*Truitt, supra,* 59 Cal.App.4th at p. 1186.) Shortly after the complaint was filed, an investigator for the plaintiff's attorneys interviewed the operator of the front-end loader and obtained a written statement from him. (*Ibid.*) When counsel for the defendant discovered the contact, the defendant brought a motion for a protective order and for evidentiary and monetary sanctions. (*Ibid.*) The court granted the motion in part, ordering counsel to turn over the statement to defendant and prohibiting counsel from

using the statement for any purpose. (*Id.* at p. 1187.) The plaintiff filed a petition for writ of mandate and the Court of Appeal granted the petition. (*Id.* at pp. 1185–1186, 1191.)

The Court of Appeal, relying extensively upon *Jorgensen*, concluded that there was no substantial evidence that counsel for the plaintiff had actual knowledge that defendant's employee was represented by counsel at the time of the interview. (*Truitt, supra,* 59 Cal.App.4th at pp. 1187–1189.) In doing so, the Court of Appeal emphasized that "[a] bright line rule is absolutely necessary in this situation. [Citation.] Lawyers should not be at risk of disciplinary action for violating rule 2-100 because they 'should have known' that an opposing party was represented or would be represented at some time in the future. Rule 2-100 does not provide for constructive knowledge. It provides only for actual knowledge." (*Truitt, supra,* at p. 1188.) The court also concluded that in that case there was no evidence the defendant organization was even represented by counsel at the time of the interview. (*Id.* at p. 1190.) Finally, the court rejected the defendant's argument that ex parte contacts with employees should be prohibited after litigation has been filed. The court held that rule 2-100 had no such proscription in its terms. (*Truitt, supra,* at p. 1190.)

Quantum argues that it is enough that Larabee should have known that Janikas and Lewis were employees subject to rule 2-100, that there was a duty to inquire of opposing counsel, and if an agreement could not be reached as to the contact, Larabee was required to submit the matter to a court to make the determination. These arguments are unavailing.

■ Quantum ignores the holdings of *Jorgensen* and *Truitt* that actual knowledge is required before an attorney can be held to have violated rule 2-100. Nor does rule 2-100 require advance permission of opposing counsel or an order from the court prior to contacting employees that are not within the scope of 2-100. We agree with *Jorgensen* and *Truitt* that a bright line rule is necessary because attorneys "should not be at risk of disciplinary action for violating rule 2-100 because they 'should have known' that an opposing party was represented or would be represented at some time in the future. Rule 2-100 does not provide for constructive knowledge. It provides only for actual knowledge." (*Truitt, supra,* 59 Cal.App.4th at p. 1188.)

■ We emphasize, however, that in cases where an attorney has reason to believe that an employee of a represented organization might be covered by rule 2-100, that attorney would be well advised to either conduct discovery or communicate with opposing counsel concerning the employee's status before contacting the employee. A failure to do so may, along with other facts, constitute circumstantial evidence that an attorney had actual

knowledge that an employee fell within the scope of rule 2-100. It might further provide support for a more drastic sanction if a violation of rule 2-100 is found. Further, as discussed, *ante*, once actual contact is made, an attorney should first ask questions that would establish the employee's status within an organization before moving to substantive questions.

 Here, however, there is no evidence that Larabee knew that these employees were within Quantum's "control group," that they were "managing-speaking agents" of Quantum, or that he sought to question them about their own actions or omissions that could be binding on or imputed to the organization. In fact, Larabee's information from his client Snider was that they were no more than salespersons. Counsel for Quantum did not tell Larabee that it deemed these employees to be represented parties. Larabee's conversation with Janikas did not reveal anything that would indicate otherwise, necessitating an end to the conversation. Larabee was never able to talk substantively to Lewis. In short, there is no evidence that in this case Larabee had actual knowledge that Janikas and Lewis were "represented parties" under rule 2-100. Without such actual knowledge, there can be no violation of rule 2-100.

### III. *Disqualification of Counsel*

Because we have concluded that Attorney Larabee's contacts with Janikas and Lewis did not violate rule 2-100 and that he did not otherwise breach the attorney-client privilege, there were no proper grounds for the disqualification order, and the court abused its discretion in granting Quantum's motion.

### DISPOSITION

Let a writ of mandate issue directing the Superior Court of the County of San Diego to vacate its order disqualifying Attorney Larabee and his law firm from representing Snider in this action. The stay issued by this court on April 3, 2003, is vacated. Petitioner to receive his costs incurred on this writ proceeding.

McConnell, P. J., and Huffman, J., concurred.